**DEFIANCE BUTTON MACHINE COMPANY, Plaintiff-Appellant,**

v.

**C & C METAL PRODUCTS CORP. and Defiance Button Machine Company, Inc., Defendants-Appellees.**

No. 511, Docket 84–7775.

United States Court of Appeals, Second Circuit.

Argued Dec. 3, 1984.

Decided April 4, 1985.

Paul Fields, New York City (Terry Sue Zisowitz, McAulay, Fields, Fisher, Goldstein & Nissen, New York City, of counsel), for plaintiff-appellant.

Henry L. Shenier, New York City (William A. Kinnaman, Jr., Shenier & O'Connor, New York City, of counsel), for defendants-appellees.

Before MANSFIELD, OAKES and NEWMAN, Circuit Judges.

MANSFIELD, Circuit Judge:

Defiance Button Machine Company (Defiance-NY), a New York corporation, appeals from an order and judgment of the Southern District of New York, entered after a non-jury trial before Judge Gerard L. Goettel, dismissing its complaint under the Lanham Act, 15 U.S.C. §§ 1051–1127 (1982), which seeks injunctive relief against defendants' use of its trademark DEFIANCE and trade name Defiance and damages. Plaintiff also appeals from the dismissal of its claim of alleged conversion of its customer lists and from the district court's refusal to permit it to amend its complaint to add a claim for conversion of its casting molds. The district court held that Defiance-NY abandoned its trademark when it sold the physical assets it used to produce goods under its trademark and name, even though the trademark and trade name were expressly excluded from the assets sold and there was evidence that the company, under new ownership, planned to use them in the production and sale of goods of substantially the same quality and nature as those produced under the mark. We reverse the dismissal of the claim based on unlawful use of plaintiffs' trademark and trade name. We affirm both the dismissal of the claim for conversion of the customer lists and the denial of leave to amend the complaint.

Prior to the events giving rise to this lawsuit Defiance-NY, beginning in 1886, had been continuously engaged in the production and sale of metal buttons, button parts, button-making machines, dies and items of a similar nature. Until the mid-1970s it was a highly successful and growing manufacturer in the button and button parts field and had expanded its business into production of buttons and parts for use in the furniture industry and developed excellent customer relations and goodwill. Its trademark DEFIANCE was well known in the field, as was its trade name, and during almost 100 years of its operation substantial goodwill attached to the mark, name, and business associated with them.

Metal buttons and button parts are manufactured through use of dies and machines furnished by machinery suppliers according to specifications. Many buttons and button parts made by one manufacturer duplicate or are interchangeable with those made and sold by competitors. To the extent that a manufacturer does not have machinery capable of duplicating a competitor's product it can often obtain dies and machines that will do so. However, the wide variety in sizes and specifications of buttons and parts, coupled with the large number of different types sold, has led manufacturers to adopt as a common practice the procedure of purchasing a portion of their respective inventories from competitors for resale under the purchaser's trade name rather than requiring each manufacturer to make the entire line. During the period here involved, for instance, Defiance-NY sold approximately 3,000 different types of buttons and parts to some 1,500 customers. According to testimony at trial and at oral argument on appeal, it purchased approximately ¼ to ⅓ of these for resale under the DEFIANCE trademark. These purchases were made from competitors, which included Handy Button Machine Company (Handy), C & C Metal Products Corp. (C & C), Astor Berning Corp., Maxant Corporation and Wade Button Co. Thus it may be possible for a company to make the merchandise offered for sale to its clientele, to purchase buttons and button parts from others for such resale, or to do both.

In the late 1970s Defiance-NY's business fortunes began to wane due to a downturn in the general economy, a decrease in demand for buttons, button parts and machinery, which was attributable to changes in furniture styles, and a cash flow problem which arose when Herbert Silberman, one of two court-appointed co-conservators for a 50% shareholder in the company, Beatrice Bauer, demanded payment of dividend checks that she had not cashed over the years. The company was forced to obtain a secured loan from Walter E. Heller & Co., to satisfy this obligation.

In 1980 Defiance-NY's shareholders decided to sell the company as a going concern. However, various offers by different parties in 1981 and 1982 to purchase the company, though recommended by the company's president, Frank V. Maner, Jr., were consistently blocked by Silberman's refusals to approve them. Among those seeking to purchase the business in early 1982 were Handy, Astor Berning, and C & C. Each specified that its offer was not only for Defiance-NY's machinery but also its trade name and customer lists. As a result of its inability to obtain Silberman's consent, Defiance-NY on March 1, 1982, announced that it would terminate its manufacturing operation but continue to supply inventory items to its customers and that it hoped to keep the name alive by selling its goodwill and reputation, presumably so that its business could be continued.

In June 1982 Heller & Co. declared Defiance-NY to be in default on its loan with the result that an auction sale was held on September 16, 1982, at which assets, including those shown on a detailed list (which did not include its trademark, trade name, goodwill, customer lists, accounts receivable, a Fiat automobile, and its real estate), were sold in bulk to C & C for approximately $300,000. Thomas Lally, who authorized the auction, testified that in addition to the trademark and other property expressly excluded from the assets to be sold, the customer lists were not to be sold and remained the property of Defiance-NY. The proceeds from the auction were sufficient to pay off the Heller loan and leave a balance for Defiance-NY. The assets sold at auction to C & C included machinery, office equipment (including a computer), tools, dies, jigs, fixtures, work in progress, raw material, and finished goods.

Following the auction Maner approached each of Defiance-NY's competitors to determine whether it would be interested in purchasing Defiance-NY's trademark, trade name, customer lists and trade information for use in its business. Bernard Chalfin, Vice-President of C & C, made an offer to Maner, who had left Defiance-NY

to become employed by Handy, to purchase these intangibles for $10,000, which was not accepted. There followed a decision by Defiance-NY to resume business. In December 1982 Handy made an offer to the stockholders of Defiance-NY (including the two co-conservators for Ms. Bauer) to purchase their outstanding stock for $162,287, which led to the negotiation of an agreement between the parties in April 1983. However, due to Silberman's opposition, which necessitated obtaining court approval, and due to pension fund problems, the sale of Defiance-NY's stock was not consummated until May 18, 1984. Defiance-NY, with Maner as its president, thereupon became a subsidiary of Handy. Since that time Defiance-NY, with capital of some $325,000, has planned to resume operation by purchasing buttons and parts from Handy Button and other former suppliers for resale. Sales will be made under its trade name and merchandise will bear its trademark DEFIANCE.

In the meantime, upon Defiance-NY's non-acceptance of C & C's $10,000 offer for its trademark, trade name and goodwill, C & C, within two weeks after the auction, formed the defendant Defiance Button Machine Company, Inc. (Defiance-NY) under the laws of New Jersey and soon had letterheads printed which were identical to those used by Defiance-NY except that the address differed and instead of the phrase "Established 1886" the stationery bore in the same size print the phrase "Predecessor Established 1886," which clearly referred to Defiance-NY. The New Jersey corporation also copied Defiance-NY's fanciful logo that had been used by it both on its letterhead, on its packaging and in its sales materials, and arranged to have the identical logo printed on its letterhead. In addition, Defiance-NJ began using labels substantially identical to Defiance-NY's trademark, trade name and distinctive logo in the packaging of buttons and button parts sold to customers. Moreover, news articles originated by Defiance-NJ and distributed to customers made it appear that Defiance-NJ was the same as Defiance-NY and that the latter had become part of C &

C, which was not true. As Judge Goettel found, though, Defiance-NJ discontinued the misleading advertising after its initial use. In short, however, C & C, through its newly formed New Jersey company, took immediate steps to use Defiance-NY's trade name, trademark and goodwill to promote the New Jersey company's new business, despite the absence of any authority from Defiance-NY and after C & C's offer to purchase this property for $10,000 had not been accepted. After the New Jersey company went into business Defiance-NY frequently received checks for invoices issued by Defiance-NJ. Although this might be attributable to the failure of button purchasers to update their records to show Defiance-NJ's address, it could also indicate that the customers may have been misled into the mistaken belief that Defiance-NJ was the same as Defiance-NY.

In October 1982, shortly after the auction sale, Defiance-NJ employed as its general manager Cecil F. Wirth, who had been employed by Defiance-NY for many years and has since brought suit against it for deferred salaries. When Defiance-NY ceased manufacture in March 1982 Wirth was left in charge of its premises, where that company's trade secrets, consisting of customer lists and price list groupings maintained in customer files, were stored in the memory bank of its computer and available on discs as backup records. The computer, but not the software, had been listed as an asset to be sold at auction. The discs were kept in a safe on the premises until it was removed with certain other property sold at the auction, whereupon they were placed in a locked room. During this period Mr. Chalfin of C & C was permitted to enter the premises for the purpose of removing property purchased by C & C that was still in the custody of Defiance-NY. Mr. Chalfin, who did not know how to operate the computer, which his company C & C had purchased from Defiance-NY in the auction sale, communicated with the former Defiance-NY operator of the computer, Rita Colletto, who had left its employ in April 1982. He paid her on

two occasions, without any authorization from Defiance-NY, to demonstrate the use of the computer. During these demonstrations and possibly at Chalfin's request, Colletto printed out Defiance-NY's customer lists from Defiance-NY discs on the premises, which, according to Chalfin's testimony and that of Wirth, had been left lying around the premises after the auction. Mr. Maner, on the other hand, testified that he had placed the company's records in a locked room. The computer operator testified that at the times when she was called by Mr. Chalfin to operate the computer the discs containing the customer list information were in the computer room for billing and that copies were in a big safe. In order to have the computer print out the customer lists the computer operator was required to use the file name or code word "LSOLD," a term that could be found in source books located in the computer room.

On November 11, 1982, Willard L. Shonfeld, Executive Vice President of Handy Button, wrote Chalfin protesting its use of the Defiance-NY trademark and name in connection with C & C's sale of products on the ground that since C & C had not acquired the trademark and name, this use constituted a misappropriation of the name and a misrepresentation to the trade. Despite this protest, Defiance-NJ, beginning on November 18, 1982, started shipping goods to customers under the trademark DEFIANCE and continued thereafter. This was followed by a letter dated January 10, 1983, from Defiance-NY to Chalfin and a letter dated January 19, 1983, from Defiance-NY's counsel to Chalfin, both protesting the defendants' use of the Defiance trademark and name and threatening suit unless C & C ceased using them. When C & C did not respond but continued shipping buttons and button parts under the trademark DEFIANCE, Defiance-NY on February 3, 1983, commenced the present action, invoking jurisdiction under the Lanham Act, 15 U.S.C. § 1121, and diversity jurisdiction. The complaint sought preliminary and permanent injunctive relief, damages, an accounting for profits realized from the alleged infringement, costs and attorney's fees.

On February 22, 1983, Judge Goettel denied preliminary relief on the grounds that damages would provide an adequate remedy and that Defiance-NY had failed to establish a threat of irreparable harm. On December 23, 1983, pursuant to leave of court, Defiance-NY amended its complaint to add a claim for conversion of its customer lists. Judge Goettel, to whom the case was tried without a jury, held a three-day trial. At the close of the evidence he denied Defiance-NY's motion to conform the pleadings to the proof by adding a claim alleging conversion of its casting molds (used to make button-making machinery) located at a Pennsylvania foundry, which had not been on the list of property sold at auction, on the ground that the motion was untimely since additional discovery would have been required by the defendants to meet the issues raised by this new claim.

Judge Goettel rendered oral findings and conclusions to the effect that the plaintiff had failed to sustain its trademark claims for the reason that as a matter of law it had, within the meaning of 15 U.S.C. § 1127, abandoned its exclusive right to the trademark DEFIANCE and its trade name Defiance. Title 15 U.S.C. § 1127 provides, in relevant part:

"A mark shall be deemed to be 'abandoned'—

(a) When its use has been discontinued with intent not to resume. Intent not to resume may be inferred from circumstances. Nonuse for two consecutive years shall be prima facie abandonment.

(b) When any course of conduct of the registrant, including acts of omission as well as commission, causes the mark to lose its significance as an indication of origin."

Judge Goettel found that Defiance did not intend to abandon the mark or name and that an intent to abandon will not be presumed from the owner's mere non-use of the mark. He further found that Defiance-NY "is presently implementing procedures to reestablish itself as a complete supplier

of buttons, button parts, etc. under its DE-FIANCE mark." However, he concluded that the mark lost its significance as an indication of origin within the meaning of § 1127(b) when Defiance-NY (1) sold its equipment, inventory, and raw material, (2) offered for sale its factory, (3) discharged its manufacturing employees, and (4) publicly announced its discontinuation of manufacturing activities. In Judge Goettel's view, even though Defiance-NY planned to use its goodwill and mark, its conduct in shutting down operations and inadvertently making its customer lists available to C & C effectively separated the mark from the goodwill it had symbolized. He also dismissed Defiance-NY's claim for conversion of its customer lists on the ground that they had lost their status as trade secrets by reason of its failure to protect them as such.

From these rulings and the court's order and judgment entered thereon Defiance-NY appeals.

### DISCUSSION

*The Parties' Rights With Respect to the Trademark*

█ A trademark or trade name symbolizes the goodwill attaching to a business. Since it represents the reputation developed by its owner for the nature and quality of goods or services sold by him, he is entitled to prevent others from using the mark to describe their own goods. *Prestonettes, Inc. v. Coty*, 264 U.S. 359, 368, 44 S.Ct. 350, 351, 68 L.Ed. 731 (1924); *United Drug Co. v. Theodore Rectanus Co.*, 248 U.S. 90, 97, 39 S.Ct. 48, 50, 63 L.Ed. 141 (1918); *Marshak v. Green*, 746 F.2d 927, 929 (2d Cir.1984). However, if the owner expressly abandons his mark, such as by cancelling it, or discontinues using it with the intent not to resume use, others are no longer restrained from using it since it ceases to be associated in the public's mind with the owner's goods or services. *Manhattan Industries, Inc. v. Sweater Bee by Banff, Ltd.*, 627 F.2d 628, 630 (2d Cir.1980).

█ The mark also ceases to be enforceable against others when it loses its significance as an indication of the origin of goods sold by and associated with the mark owner, such as when the owner makes the mark the subject of an unrestricted license or sale to others, *Haymaker Sports, Inc. v. Turian*, 581 F.2d 257, 261 (C.C.P.A.1978); *Universal City Studios, Inc. v. Nintendo Co., Ltd.*, 578 F.Supp. 911, 929 (S.D.N.Y. 1983), *aff'd on other grounds*, 746 F.2d 112, (2d Cir.1984), or the mark has become generic, *Abercrombie & Fitch Co. v. Hunting World, Inc.*, 537 F.2d 4, 9 (2d Cir.1976), or the owner assigns the mark without the goodwill associated with it, 15 U.S.C. § 1060; *Marshak v. Green, supra; Universal City Studios, Inc. v. Nintendo Co. Ltd., supra*, 578 F.Supp. at 922–23. Under such circumstances the mark is held to have been abandoned for the reason that there "are no rights in a trademark apart from the business with which the mark has been associated" and the "[u]se of the mark by the assignee in connection with a different goodwill and different product would result in a fraud on the purchasing public who reasonably assume that the mark signifies the same thing, whether used by one person or another," *Marshak v. Green*, 746 F.2d at 929 (2d Cir.1984); *accord Universal City Studios v. Nintendo Co., supra*, 578 F.Supp. at 922–23 (holding invalid the separate transfer of the King Kong mark by its owner when all of the business associated with the mark had been developed by a third party movie studio).

█ Nonetheless, assignments of marks separate from the underlying business have been upheld when the assignee "is producing a product ... substantially similar to that of the assignor [such that] consumers would not be deceived or harmed" or when there is "continuity of management." *Marshak, supra*, 746 F.2d at 930. Thus, a trademark may be validly transferred without the simultaneous transfer of any tangible assets, as long as the recipient continues to produce goods of the same quality and nature previously associated with the mark. *See Hy-Cross*

*Hatchery, Inc. v. Osborne,* 303 F.2d 947, 950 (C.C.P.A.1962) (denying a petition to cancel a registered trademark for a poultry business when the mark had been transferred, without any assets other than the goodwill associated with the name, to another producer, who thereafter raised a different variety of chicken); *VISA, U.S.A., Inc. v. Birmingham Trust National Bank,* 696 F.2d 1371 (Fed.Cir.1982), *cert. denied,* —— U.S. ——, 104 S.Ct. 98, 78 L.Ed.2d 104 (1983); *Sterling Brewers, Inc. v. Schenley Industries, Inc.,* 441 F.2d 675, 680 (C.C.P.A.1971).

■ Moreover, an intent to abandon a mark will not be presumed from the owner's mere non-use of it for a period shorter than two years, as set forth in § 1127(a), and the presumption of abandonment following from non-use for a longer period is rebuttable, *Sterling Brewers, Inc. v. Schenley Industries, Inc., supra,* 441 F.2d at 679–81; *Saratoga Vichy Spring Co., Inc. v. Lehman,* 491 F.Supp. 141, 155 (N.D. N.Y.1979), *aff'd,* 625 F.2d 1037, 1043–44 (2d Cir.1980). Nor does a company's cessation of business automatically and immediately terminate its rights to a mark. *Sterling Brewers, Inc. v. Schenley Industries, Inc., supra,* 441 F.2d at 677, 681; *Merry Hull & Company v. Hi-Line Co.,* 243 F.Supp. 45 (S.D.N.Y.1965). As the *Merry Hull* court stated:

> "Since the purpose of a mark is to protect the goodwill of a business, a right in the mark is created by its adoption and use in connection with that business, and if there is no business there is no goodwill and therefore nothing to protect. This is not to say, however, that goodwill can exist only in connection with an active going business and that at the moment business is suspended the goodwill ceases to exist." 243 F.Supp. at 50.

Thus, the *Merry Hull* court upheld the purchaser's rights to a mark that it purchased from a bankruptcy trustee along with some physical assets, several months after the bankruptcy and one month after the trustee stopped filling orders, even though the buyer delayed several more months before beginning production under the mark. The goodwill of the company survived this transition, and the purchaser was able "to 'go on in real continuity with [the] past.'" *Id.* at 51 (quoting *Mutual Life Ins. Co. v. Menin,* 115 F.2d 975 (2d Cir.1940)). This rule recognizes that goodwill does not ordinarily disappear or completely lose its value overnight. Erosion from non-use is a gradual process. As long as the mark has significant remaining value and the owner intends to use it in connection with substantially the same business or service, the public is not deceived.

■ If neither the separation from tangible assets, by itself, nor the termination of a business, by itself, will necessarily and immediately vitiate a mark and its associated goodwill, we see no reason why, under appropriate circumstances, the combination of these two events must inevitably destroy instantaneously the owner's goodwill and strip the owner of any right to its mark. The policies and practices of prior abandonment cases are consistent with the preservation of the mark in this situation, so long as (a) the goodwill of the concern has not wholly dissipated, (b) the owner or its assignee retains the intent to produce or market within a reasonable time a product or service substantially the same in nature and quality as that with which the trademark has been associated, and (c) such resumption of operations occurs within a reasonable time under the circumstances.

■ Applying these principles to the present case, the record is clear that Defiance-NY never intended to abandon its trademark and Judge Goettel so held. Upon its cessation of manufacturing operations in March 1982 it continued to sell merchandise from its inventory under its trademark and trade name until the auction sale of its tangible manufacturing assets in September 1982. Thereupon, for a very short period, it sought to sell the mark and name, which had been expressly excluded from the assets sold at auction, to one of several competitors for use in connection with the sale of buttons and parts of sub-

stantially the same quality under its trademark DEFIANCE, which would have been permissible. *Merry Hull & Company v. Hi-Line Co., supra,* 243 F.Supp. at 50; *cf. Marshak v. Green, supra,* 746 F.2d at 930; *Hy-Cross Hatchery, Inc. v. Osborne, supra.* However, when the only offer—$10,000 from Chalfin, President of C & C—proved to be inadequate, Defiance-NY decided to resume business under its own name, acting as an independent purchaser for resale to the same trade under its DEFIANCE trademark of buttons and parts of the same quality it had previously manufactured and sold for almost 100 years. There followed within several months the negotiations of an agreement by the company's stockholders for sale of their stock to Handy on the understanding that the recapitalized Defiance-NY would resume its former business under its own trade name and sell buttons and parts under its DEFIANCE trademark. Continuity of management would be provided by Frank V. Maner, Jr., who had been the President of Defiance-NY for many years. The company also retained a copy of its customer lists, notwithstanding Defiance-NJ's use of another copy. Thus, from the time it ceased manufacturing activities until it became a wholly-owned subsidiary of Handy its conduct was at all times inconsistent with an intent to abandon its trademark or trade name. Title 15 U.S.C. § 1127(a) (quoted *supra,* p. 1058) therefore cannot provide a basis for claiming abandonment and the district court properly found no intent to abandon.

The district court nevertheless found, and defendants argue, that Defiance-NY's course of conduct in ceasing operations and selling its manufacturing assets without simultaneously transferring its goodwill, mark and name to the purchaser, caused the mark to "lose its significance as an indication of origin" within the meaning of 15 U.S.C. § 1127(b) (quoted in full, *supra,* p. 1058) and amounted to an abandonment of the mark. We disagree. In the first place, we question whether § 1127(b) was intended by Congress to apply to conduct of the type existing here, in which the owner of the mark seeks to prevent its use by others and intends to keep the mark alive and to have it used in a resumed business; the statute was designed to preclude assertion of a right to enforce a mark that has become generic or has been licensed in gross or officially cancelled. As the Court of Customs and Patent Appeals (now the Federal Circuit) noted in *Wallpaper Manufacturers, Limited v. Crown Wallcovering Corp.,* 680 F.2d 755, 766 n. 13 (C.C.P.A. 1982):

> "From the legislative history it is evident that abandonment under part (b) was principally intended to encompass acts of omission or commission by the registrant which resulted in the mark becoming a generic term. *See e.g.* Hearings on H.R. 102, H.R. 5461 and S. 895 before the Subcom. on Trademarks of the House Comm. on Patents, 77th Cong., 1st Sess. 104–115 (1941)."

Secondly, in the present case the mark DEFIANCE did not lose its significance upon Defiance-NY's sale of its manufacturing assets but continued to have substantial value measured by the residual goodwill attaching to the company's business, which did not vanish overnight. The continued existence and value of the company's goodwill and of the mark symbolizing it may well be evidenced by C & C's offer to purchase the mark for $10,000 immediately after the auction sale, by its unauthorized duplication and misappropriation of Defiance-NY's name, letterhead and individually-created, unique and fanciful logo, and by Handy's purchase of Defiance-NY's stock at a considerably higher price in order to obtain the mark and goodwill. If the goodwill and mark had lost their value and significance as an indication of origin it is unlikely that C & C would have offered $10,000 for them, *see Sterling Brewers, Inc. v. Schenley Industries, Inc., supra,* 441 F.2d at 679, or tried to copy them overnight. C & C's obvious purpose was to capitalize on the goodwill developed by Defiance-NY over nearly 100 years.

■ Thus the district court's decision would eliminate the significance of the DEFIANCE mark as an indicator of origin in Defiance-NY but recognize it as an indication of origin in Defiance-NJ. This was error. We do not believe that § 1127(b) was designed to bring about such an unfortunate result; it was intended to apply only when a mark ceases to be capable of indicating any single origin, which is not the situation here.

The fundamental error in defendants' position is their assumption that a business' goodwill and the mark symbolizing it are lost whenever the business loses its tangible assets or ceases active conduct of its operation. If that were the case, the destruction of a business' factory or its bankruptcy would terminate its goodwill, even though it resumed business and use of the mark after reconstruction of the plant or emergence from bankruptcy. Such an unjustifiable forfeiture of valuable goodwill developed by the owner at great cost and expense would clearly be unacceptable. *See Merry Hull & Company v. Hi-Line Co., supra*, 243 F.Supp. at 50–52. It is true that when the owner discontinues his business activities and ceases to use his trademark his goodwill begins to fade and if he does nothing to resume use of the mark it may eventually vanish altogether. *See* J. McCarthy, Trademarks & Unfair Competition, § 17:3, at 594–95. However, in the present case the period of non-use has been too short to dissipate substantially the goodwill built up over a period of almost 100 years, and certainly this goodwill had not dissipated when Defiance-NJ adopted the mark barely a month after the auction sale of the New York company's assets.

The bankruptcy cases relied upon by defendants in support of their contention that the DEFIANCE mark has been abandoned and has lost its significance as an indication of origin are clearly distinguishable. In *Reconstruction Finance Corp. v. J.G. Menihan Corp.*, 28 F.Supp. 920 (W.D.N.Y. 1939), the sale of the tangible assets without any reference to trademarks amounted to a permanent termination of the business to which the goodwill attached; the owner had no intention to resume the business and, indeed, could not do so because of the uniqueness of the product manufactured, a special arch-preserver shoe made according to individualized patterns. In the present case, Defiance-NY has stated repeatedly that the business has not been permanently ended but will be resumed and continued with the production by Handy and sale by its subsidiary, Defiance-NY, of buttons and parts that are the same as those sold by it in the past. Similarly, in *Hough Manufacturing Corporation v. Virginia Metal Industries, Incorporated*, 453 F.Supp. 496 (E.D.Va.1978), the trustee in bankruptcy who sold the bankrupt's assets without mentioning its goodwill or trademark "made no effort to continue the bankrupt's business," *id.* at 501, and had no intention to do so. Substantially the same factual context existed in *In re Jaysee Corset Co.*, 201 F. 779 (S.D.N.Y.1911), a rather hoary decision invoked by appellees. The *Hough* decision, moreover, acknowledged that goodwill might temporarily survive the cessation of business and found that courts "must look to all the facts and circumstances surrounding the cessation of business to determine whether the good will of a particular business survives." 453 F.2d at 500. That is just what we have done here, concluding that Defiance-NY never lost its goodwill or the intent and capacity to have its name and trademark represent a substantially equivalent product in the marketplace.

We therefore hold that Defiance-NY is entitled to restrain C & C and Defiance-NJ from using the trademark DEFIANCE and from using any trade name that includes the word Defiance. Our decision is without prejudice to the injunctions being vacated upon the defendants' successfully shouldering the burden of showing that Defiance-NY has not resumed use of the mark and name in connection with sale of buttons

and parts of substantially the same quality within a reasonable time.[1]

### The Defiance-NY Customer Lists

A customer list developed by a business through substantial effort and kept in confidence may be treated as a trade secret and protected at the owner's instance against disclosure to a competitor, provided the information it contains is not otherwise readily ascertainable. *See Leo Silfen, Inc. v. Cream*, 29 N.Y.2d 387, 393–95, 328 N.Y.S.2d 423, 427–29, 278 N.E.2d 636, 639–41 (1972); *FMC Corp. v. Taiwan Tainan Giant Industrial Co., Ltd.*, 730 F.2d 61, 63 (2d Cir.1984) (p.c.). However, the owner is entitled to such protection only as long as he maintains the list in secrecy; upon disclosure, even if inadvertent or accidental, the information ceases to be a trade secret and will no longer be protected. *Kewanee Oil Co. v. Bicron Corp.*, 416 U.S. 470, 475–76, 94 S.Ct. 1879, 1883–84, 40 L.Ed.2d 315 (1974); *Fisher Stoves, Inc. v. All Nighter Stove Works, Inc.*, 626 F.2d 193, 196 (1st Cir.1980); Restatement of Torts, § 757, comment b, at 6 (1939) ("[A] substantial element of secrecy must exist, so that, except by the use of improper means, there would be difficulty in acquiring the information."); *see also FMC Corp., supra*, 730 F.2d at 63 (stating generally that New York follows Restatement of Torts § 757, comment b).

Accordingly, "the courts require that the possessor of a trade secret take reasonable measures to protect its secrecy." 1 R. Milgram, Milgram on Trade Secrets § 2.04, at 2–36 (1984); *see* Restatement of Torts, § 757, comment b at 6 (listing as two of six factors to be considered in determining whether given information is a trade secret: "the extent of measures taken by [the owner] to guard the secrecy of the information" and "the ease or difficulty with which the information could be properly acquired or duplicated by others"); *Rapco Foam, Inc. v. Scientific Applications, Inc.*, 479 F.Supp. 1027, 1029 (S.D.N.Y. 1979); *see also* 1 R. Milgram, *supra*, § 2.04, at 2–38 to 2–39 (characterizing as apt the principle that "one may not venture on liberties with his own secret, may not lightly or voluntarily hazard its leakage or escape, and at the same time hold others to be completely obligated to observe it"). Absent such measures, a customer list will cease to be a trade secret and will lose the protections of trade secret law. *See, e.g., Fisher Stoves, Inc., supra*, 626 F.2d at 196 (holding unprotected a dealer list found by a competitor on the counter of a store); *McCann Const. Specialities Co. v. Bosman*, 44 Ill.App.3d 1020, 3 Ill.Dec. 655, 657, 358 N.E.2d 1340, 1342 (2d Dist.1977) (refusing to hold a customer list to be a trade secret when it was "not under lock and key, and there [was] no evidence of any effort on the part of the plaintiff to insure that [the] list should be considered secret or confidential").

In the present case, Judge Goettel found that Defiance-NY's customer lists lost their character as trade secrets because the company failed, upon selling most of its tangible assets (including its computer), to take reasonable steps to protect the lists from coming into C & C's hands. Since that finding is not clearly erroneous we accept it and affirm the district court's dismissal of the claim alleging conversion of the lists. Fed.R.Civ.P. 52(a); *see* 1 R. Milgram, *supra*, § 2.03 at 2–32 to 2–33 ("Existence of a trade secret is a question of fact for the determination of the trier of fact, secrecy being a basic element.") (Footnotes omitted).

The record reveals that Defiance-NY did not intend to disclose the lists to C & C and that it did keep the confidential data on discs in a locked room. However, the information was also left in the memory of the computer sold by Defiance-NY to C & C, from which it could be retrieved by using a file name or password readily available in source books to which C & C had access. In failing to segregate the source books and to erase the lists from the com-

---

**1.** In order to continue using its trademark and trade name Defiance-NY should not be required to resume sale of every single item of its earlier line as long as it offers for sale items representing a substantial portion of that line.

puter, ownership of which was transferred to C & C, Defiance-NY did not take adequate measures to ensure the secrecy of the lists. Hence, even though C & C may have obtained the lists by improper means—paying Colletto, a former employee of Defiance-NY, to extract the information from the computer—any such impropriety does not create liability for use of a trade secret, since by failing to protect the lists from ready access by C & C independent of Colletto's assistance, Defiance-NY had forfeited the protections of trade secret law.

*The District Court's Denial of the Motion to Amend the Complaint*

▮▮▮ The complaint contains no claim that C & C converted casting molds owned by Defiance-NY which were to be used for manufacturing button-making machinery. At trial there was evidence that the company owned such molds and that they were not specifically listed among the assets and machinery sold to C & C at the September 1982 auction. C & C contends that Heller had a security interest in "all" of Defiance-NY's machinery and was authorized to sell the molds in a "bulk sale" as part of the "product lines" listed for sale. At the close of trial Judge Goettel denied plaintiff's motion under Fed.R.Civ.P. 15(b) to amend the pleadings to conform to the proof and thus include a claim of conversion of the molds. We find no abuse of discretion in his so ruling. Since Defiance-NY's attorney expressly stated at the start of trial that it was limiting its conversion count to the customer lists and since evidence regarding the molds was relevant to the pleadings as they stood at that time, the court was not required to treat the issue as tried by consent of the parties. As C & C was not on notice that a new issue was being added to the trial, it cannot be found implicitly to have consented. *See* 3 Moore's Federal Practice, ¶ 15.13[2], at 15–174 to 15–177 (2d ed. 1948 & Supp.1984); *Haught v. Maceluch*, 681 F.2d 291, 305–06 (5th Cir.1982). Furthermore, Judge Goettel found that further discovery would have been necessary for trial of the issue.

## CONCLUSION

The district court's denial of plaintiff's motion to amend the complaint to include a claim of conversion of molds and its dismissal of its claim of conversion of customer lists are affirmed. The order and judgment dismissing plaintiff's claim of unlawful use of its trademark DEFIANCE and its trade name Defiance is reversed. The case is remanded with directions to enter a judgment enjoining the defendants from further use of the trademark and trade name. Upon remand the district court will determine what damages, if any, have been suffered by plaintiff from the defendants' unlawful use of its mark and name, and Defiance-NY will be afforded the opportunity to demonstrate that it is entitled to an accounting under the standards discussed in *Burndy Corporation v. Teledyne Industries, Inc.*, 748 F.2d 767 (2d Cir.1984), and cases cited therein. In the event that Defiance-NY does not within a reasonable period of time resume use of its mark and name in connection with the sale of buttons and button parts of substantially the same quality as those hitherto sold by it, the defendants may move to vacate any order or judgment of the district court entered pursuant to this decision. Jurisdiction of the case is retained by this panel for purposes of considering any possible future appeal. The mandate shall issue forthwith. Costs to appellant.

OAKES, Circuit Judge (concurring in part and dissenting in part):

I agree with all of Judge Mansfield's thorough and well-reasoned opinion except that part pertaining to the customer lists lifted, so to speak, from the Defiance-NY computer's memory. The lifting was done, it seems to me, by artifice. The diskettes containing the lists were kept in a safe in a locked room. While the lists were in the computer's memory, it was coded so that the password "LSOLD" had to be given to the computer to obtain a printout. Only the controller and the computer operator, Rita Colletto, knew the code, though it was

in the source book. She had been retired and did not even know about the auction when Chalfin contacted her to come in and operate the computer. Their testimony differed, he saying that she chose the customer list diskette, she that he asked her to run off the list of customers. Peel-off labels were not available, so she set up the machine for doing them, according to her testimony, and a day or two later Chalfin called her by telephone to ask her how to get it working and she told him. In essence C & C argues, and the court decides, that if a coded list is left in the computer's memory and the codeword is in a source book which is not under lock and key, the trade secret is abandoned, even if the codeword is obtained through an unwitting operator rather than the source book. I disagree, think it was obtained by improper means, Restatement of Torts § 757 (1939), and would reverse on this point accordingly.