The MURPHY DOOR BED CO., INC., Plaintiff,

v.

INTERIOR SLEEP SYSTEMS, INC., d/b/a Murphy Beds, Etc., Murphy Bed Co. of America, Inc. in Florida, Murphy Bed Co. of America, Inc. in Georgia, and Frank Zarcone, individually, Defendants.

No. CV 86–4256.

United States District Court, E.D. New York.

May 13, 1988.

---

Robert I. Skoy, Mineola, N.Y., for plaintiff; Leon Friedman, Hofstra Law School, Hempstead, N.Y., of counsel.

Malin, Haley & McHale, P.A., Fort Lauderdale, Fla., Lilling & Greenspan, White Plains, N.Y., for defendants; Edward F. McHale and Dale P. DiMaggio, Fort Lauderdale, Fla., of counsel.

## MEMORANDUM OF DECISION
## AND ORDER

MISHLER, District Judge.

Murphy Door Bed Co., Inc. ("Murphy") seeks compensatory and punitive damages and injunctive relief on three claims stated as: (1) infringement of the trademark Murphy Bed; (2) unfair competition; and (3) breach of contract dated December 9, 1981.

Defendants deny the material allegations of the complaint and, *inter alia*, assert as affirmative defenses: (1) estoppel by reason of Murphy's "inequitable conduct in inducing Interior Sleep Systems, Inc. to enter into a purported 'franchise agreement' based exclusively on alleged trademark rights; (2) failure of consideration in the fraudulent representation that Murphy owned the trademark 'Murphy Bed'; (3) fraud in inducing Interior Sleep Systems, Inc. and Frank Zarcone (I.S.S. and Zarcone will be referred to as Zarcone) to enter into the agreement of December 9, 1981 in representing ownership of the trademark 'Murphy Bed.' "[1] The court severed the claims of Zarcone against third parties and directed a trial of the issues of liability on Murphy's claims against Zarcone and the other corporate defendants and Zarcone's counterclaims against Murphy.

The issues of fact were tried to the court without a jury. The court finds:

In or about 1900, William L. Murphy started the manufacture of a wall bed in San Francisco, California. The bed was concealed in a closet of a wall when not in use. When ready for use it was lowered to a sleeping position by a counter-balancing mechanism. In 1918, the United States Patent Office granted Mr. Murphy a patent on a "pivot bed" designed along the lines of the wall bed, but permitting the bed to be swung out of the closet for access to the closet. William L. Murphy did business in California under the name Murphy Door Bed Company. He manufactured and sold the wall bed under the name "Murphy" and "Murphy Bed."

In 1925 the Murphy Door Bed Company moved its base of operations, including the manufacture of the wall bed, to Suffolk County, New York and incorporated Murphy Door Bed Company, Inc. under the laws of the State of New York. William L. Murphy, the founder of Murphy, died in 1959 and his son, William K. Murphy, succeeded him as president of Murphy. Though some minor changes were made in the design of the wall bed throughout the years, Murphy has continued to the present time to market the wall bed, as originally conceived, under the trademark "Murphy Bed." It is sold through distributors and agents throughout the fifty states of the United States. Murphy, its distributors and its agents engage in extensive advertising of the wall bed as "Murphy" or "Murphy Bed." Murphy distributes a catalog of its various models nationwide through its distributors and advertises in Sweets Catalog, a service to the building trade.

The 1966 edition of Webster's Third New International Dictionary recorded the definition of a Murphy bed as "a bed that may be folded or swung into a closet when not in use." The definition was repeated in the 1981 and 1986 editions. The 1976 edition of the American Heritage Dictionary defines a Murphy bed as "A bed that folds into a closet for concealment (Designed by William Lawrence Murphy (1876–1959), U.S. inventor.)" Morris Dictionary of Word and Phrase Origins records the origin of Murphy bed as follows:

Before "convertible" sofas came into vogue, the *Murphy bed* was a commonplace in small apartments. It was simply a bed which folded or swung into a closet for concealment during the hours when it was not in use. It was designed by an American named William Lawrence Murphy (1876–1959), whose other contributions to social advancement, if any, have gone unrecorded. Various forms of folding beds (but not ones that disappeared into closets) have been displayed at the Philadelphia Centennial Exposition (1876), and General Washington used a

---

1. All defendants assert various counterclaims against Murphy based on allegations that Murphy unfairly competed in the areas of competition and against Murphy distributors.

portable folding cot during the Revolution.

*Denial of Registration by the Trademark Trial and Appeal Board*

By letter dated August 6, 1981, Murphy's counsel advised that the bed should carry the trademark Murphy. Thereafter, Murphy commenced using the mark "Murphy (tm) Beds." On August 29, 1984, the Trademark Trial and Appeal Board of the Patent and Trademark Office denied Murphy's application to register the trademark "Murphy Bed." *In re Murphy Door Bed Co., Inc.*, 233 U.S.P.Q. 1030. The Board, in classifying the mark as generic, noted:

A generic designation identifies the product itself rather than the manufacturer or other source thereof. It cannot be exclusively appropriated to the use of one party but must remain in the public domain.... Certain designations are generic in the first instance being common words of the English language, i.e., book, chair, table. Others may start out as non-generic terms but, being applied to a newly-invented product having no readily applicable generic name, may become synonymous therewith and in time lose whatever source significance they might originally have had. See McCarthy, Trademarks and Unfair Competition, § 12:8 (1984). This chain of events may occur with respect to a personal name as well as any other designation used in the first instance as a source indicator for a new product. A case in point is SINGER. (McCarthy, *supra*, § 13:9). That is, if a term has become the accepted designation for the product to which it is applied, it has been rendered a common descriptive or generic name for said product and is unregistrable.

*Id.* at 1031.

....

[W]e are of the opinion that MURPHY bed has for a long period of time been used by a substantial segment of the public as a generic term for a bed which folds into a wall or a closet.

*Id.* at 1033.

The application which the Trademark Trial and Appeal Board denied was originally filed on July 22, 1980. On March 23, 1981, the Examining Attorney of the Patent and Trademark Office wrote:

Registration is refused on the Principal Register because the mark, when applied to goods and/or services, is considered to be merely of the Trademark Act; TMEP Section 1207. It is merely descriptive of a characteristic of the goods.

The proof of distinctiveness under Section 2(f) of the Trademark Act overcomes any difficulties with regard to the issue of applicant's mark being primarily merely a surname under Section 2(e)(3) of the Act.

(Exh. 6).

On July 26, 1982, Murphy requested reconsideration of the March 23, 1981 determination and attempted to show that the trademark "Murphy Bed" indicated that Murphy manufactured and distributed the product. Murphy showed that other manufacturers of wall beds used the trademarks "Cabinet Bed," "Sleeping Device," "Convert–A–Room" and "Automatic Adjustable Hydraulic Bed." (Ex. 6—letter of Curtis, Morris, Safford, P.C.). This request was supplemented by a further request for reconsideration filed on August 6, 1982. On November 16, 1982 the Examining Attorney wrote:

[t]he term "Murphy" is at least merely descriptive of the goods in question. *In re G.E. Smith, Inc.*, 138 U.S.P.Q. 518 (TTAB 1963). The crucial question is whether the claim of distinctiveness is enough to indicate that the mark has come to identify the source of the goods ... As we previously noted in the record, the word "Murphy" has become "generic" and can be found in the dictionary to mean 'a bed that can be folded or swung into a closet.' Accordingly, the refusal to register applicant's mark is hereby repeated, and this refusal is made *FINAL.*

(Exh. 6).

*The December 9, 1981 Agreement*

Prior to the execution of the agreement made the subject of this litigation, Zarcone

was employed by Castro Convertibles, engaged in the business of manufacture and sale of sofas and club chairs which could be converted into beds. In the summer of 1981, Zarcone called William K. Murphy, president of Murphy, for an appointment to discuss a distributorship of the Murphy bed in Florida. By letter dated July 30, 1981, Murphy suggested an exclusive franchise for the sale of Murphy beds for Broward County, which franchise would be extended to Palm Beach and Dade Counties if Zarcone ordered "a minimum of 50 Murphy beds by the end of 1981." (Ex. 11). Zarcone placed orders with Murphy beginning August 6, 1981 for delivery to a showroom he had leased at 2241 S.W. 59th Avenue, Hollywood, Florida. On November 27, 1981, Zarcone formally opened the showroom at that address in the name of Interior Sleep Systems, Inc., d/b/a Murphy Beds, Etc. ("ISS").

In the meantime, Zarcone retained Coleman R. Rosenfield to prepare a letter agreement granting ISS an exclusive franchise for the sale of Murphy beds in Broward County. The letter was signed by Zarcone as president of ISS and mailed to Murphy. (Ex. 15). Murphy rejected the letter drafted by Zarcone's counsel and on December 9, 1981 mailed a letter agreement granting an exclusive franchise for the sale of Murphy beds to ISS for a period of one year beginning December 31, 1981 for the Counties of Broward, Dade, Palm Beach and Monroe. The letter was captioned: "Re: Agreement for the Sale of Murphy (tm) Beds." It provided that at the end of the term of one year the agreement would "continue indefinitely subject to either party giving the other 60 days warning of consideration of cancellation and 90 days additional notice of definite cancellation." The agreement further provided in pertinent part:

4) Interior Sleep Systems will pay for material purchased within 30 days of date of Murphy's invoice.

5) Whenever the Murphy name is used, it must be in capital letters and identified by the word trademark or TM adjacent to Murphy. Cabinets or other material not furnished by Murphy will not be promoted or sold as Murphy Products.

8) Upon termination of this agreement Interior Sleep Systems, Inc. agrees to discontinue the use of the name "Murphy Bed."

Zarcone accepted the agreement.

*Termination of the Agreement*

William Murphy fell ill in late 1982 and his son, Clark W. Murphy, became Murphy's chief operating officer. Clark Murphy became Murphy's president in August 1983.

On March 20, 1986, Zarcone received orders for 109 Murphy beds, model SL 60/80, destined for delivery to Magnolia Builders (Ex. 32). Zarcone, not Murphy, manufactured the beds and delivered them to Magnolia Builders as "Murphy Beds Model SL 60/80." Thereafter, Zarcone placed an order with Murphy for 48 beds which were delivered on May 21, 1986 together with the invoice. Zarcone's practice was to pay for goods delivered in from 60 to 90 days in violation of the contract.[2] Zarcone placed no further orders for beds for a period of four months. No payments were made on account of the balance due.

On August 21, 1986, Murphy served notice by ordinary mail on Zarcone "that as of today your franchise for the sale of Murphy Beds is cancelled." Murphy notified Zarcone by certified mail dated September 24, 1986, received by Zarcone on September 30, 1986, of the condition in the December 9, 1981 agreement (¶ 9) that upon termination Zarcone had agreed "to discontinue the use of the name 'Murphy Bed.'" The letter directed Zarcone to remove the name "Murphy Bed" from all signs, vehicles and advertising within ten days from receipt. (Ex. 33). Zarcone denies receipt of the letter dated August 21, 1986.

The method for termination of the contract is unclear in the agreement. In any event, Murphy failed to give a "60 day written warning of consideration of cancel-

---

**2.** Zarcone was charged interest at the rate of 1½% per month for late payments.

lation." Since both parties concede that the agreement was terminated, we find that Zarcone's position as to the timing of termination is fair under all the circumstances, and the contract was terminated 150 days from September 30, 1986, i.e., on February 28, 1987.

Zarcone has not purchased any wall beds from Murphy from the time of the last delivery by Murphy on May 21, 1986 to February 28, 1987, the date of termination of the contract. Wall beds were manufactured by defendant Murphy Bed Co. of America, Inc., a corporation organized and controlled by Zarcone. The wall beds were advertised and sold as Murphy Beds during the entire period.[3]

## DISCUSSION

### I. *Murphy and Murphy Beds as Trademarks*

■ The denial of registration by the United States Patent and Trademark Office does not affect Murphy's common law trademark rights. Section 43(a) of the Lanham Act "protects unregistered marks or tradenames such as [Murphy and Murphy Bed]." *Yarmuth–Dion, Inc. v. D'Ion Furs, Inc.,* 835 F.2d 990, 992 (2d Cir.1987); *see also 815 Tonawanda Street Corporation v. Fay's Drug Company,* 842 F.2d 643, 646 (2d Cir.1988); *Warner Bros., Inc. v. Gay Toys, Inc.,* 658 F.2d 76, 77–78 (2d Cir.1981) (§ 43[a] of the Lanham Act "includes protection against the infringement of common law trademarks."). Registration gives jurisdictional and procedural advantages to the registrant. The right to trademark protection arises from use—not from registration.

■ Here, the tradename is a surname, but that does not render it unprotectible. A surname is usually classified as falling into the category of descriptive terms and is protected against use by another only if it has acquired secondary meaning. *Abra-*

ham *Zion Corp. v. Lebow,* 761 F.2d 93, 104 (2d Cir.1985). Secondary meaning is established when the name comes to "symbolize a particular business, product or company" to consumers. *Dallas Cowboys Cheerleaders, Inc. v. Pussycat Cinema, Ltd.,* 604 F.2d 200, 203 n. 5 (2d Cir.1979). *See also Vibrant Sales, Inc. v. New Body Boutique, Inc.,* 652 F.2d 299, 303 (2d Cir.1981). An individual's personal name can acquire, through advertising or some other means, such a "secondary meaning"; thereupon it may become a tradename. *See Levitt Corp. v. Levitt,* 593 F.2d 463, 468 (2d Cir. 1979); Mandell, Personal Name Trademarks—Your Name May Not Be Your Own" 70 TMR 326 (1980), 3 R. CALLMAN, The Law of Unfair Competition, Trademarks and Monopolies § 17.06 (4th ed. 1983). But even when a personal name has become a tradename it continues to serve the important function to its bearer of acting as a symbol of that individual's personality, reputation and accomplishments as distinguished from that of the business, corporation or otherwise, with which he has been associated. 3 R. CALLMAN, *supra,* § 17.06; *Madrigal Audio Laboratories, Inc. v. Cello, Ltd.,* 799 F.2d 814, 822 (2d Cir.1986).[4]

■ The sale and distribution by Murphy of its product over a long period of time, its advertising expenditures and the attempt by others to plagiarize the mark, all serve to establish secondary meaning to the trademark and tradename Murphy and Murphy Bed, *see Thompson Medical Co., Inc. v. Pfizer, Inc.,* 753 F.2d 208, 217 (2d Cir.1985), subject only to the claim that its novelty and popularity transformed the mark into a generic term and stripped the mark of protectibility.

### *Defendants' Claim that the Trademark is Generic*

Defendants do not seriously challenge Murphy's right to trademark protection at

---

**3.** This action was instituted by the filing of a complaint on December 19, 1986.

**4.** In 3 R. CALLMAN, *The Law of Unfair Competition, Trademarks and Monopolies* § 21.36, at 146 (4th ed. 1983), the writer states: "A name

that has acquired a secondary significance, however descriptive it may once have been, constitutes one of the most valuable and potent marks in trade."

a time in the distant past, but they claim that "Murphy" (when the name is associated with a bed) and "Murphy Bed" no longer identify plaintiff as the manufacturer or producer of a bed that is concealed in a wall or closet when not in use. In other words, they argue that Murphy's mark has been transformed into a generic term.

■ The owner of an unregistered trademark has the burden of proving the validity of the mark, and that burden includes establishing that the mark is not unprotectible. *See National Conference v. Multistate Legal Studies, Inc.*, 692 F.2d 478, 488 (7th Cir.1982), *cert. denied*, 464 U.S. 814, 104 S.Ct. 69, 78 L.Ed.2d 83 (1983); *Reese Publishing Co., Inc. v. Hampton International Communications, Inc.*, 620 F.2d 7, 11 (2d Cir.1980). We find Murphy sustained that burden.

■ The next question is whether defendants bear the burden of showing that the valid mark was transformed into a generic word. We find that burden is on defendants.

The Lanham Act does not specifically address the kind of transformation which the mark Murphy bed allegedly underwent. 15 U.S.C. § 1127 does, however, define "abandonment" to include transformation of a mark into a generic word under certain circumstances. *See 3 R. CALLMAN, supra*, § 18.25, at 147–48. It provides in pertinent part:

A mark shall be deemed to be "abandoned"—

. . . .

(b) When any course of conduct of the registrant, including acts of omission as well as commission, causes the mark to lose its significance as an indication of origin.

As defined, abandonment has been interpreted to be an affirmative defense to be established by the party asserting it. *See Atlas Supply Company v. Atlas Brake Shops, Inc.*, 360 F.2d 16, 18 (6th Cir.1966) ("Abandonment of a trademark is an affirmative defense which must be pleaded; otherwise it is deemed waived." (*citing*

Fed.R.Civ.P. 8(c); 3 R. CALLMAN, Unfair Competition on Trademarks (2d ed.) § 79.3).

Similarly, we find that the burden is imposed on one who claims that a once valid trademark has lost protection by reason of its transformation into a generic term. *See Defiance Button Machine Co. v. C & C Metal Products Corp.*, 759 F.2d 1053, 1061 (2d Cir.), *cert. denied*, 474 U.S. 844, 106 S.Ct. 131, 88 L.Ed.2d 108 (1985); *Wallpaper Manufacturers, Ltd. v. Crown Wallcovering Corp.*, 680 F.2d 755, 766 n. 13 (C.C.P.A.1982); *DuPont Cellophane Co., Inc. v. Waxed Products Co., Inc.*, 6 F.Supp. 859, 881 (E.D.N.Y.1934) (the court having found that "plaintiff has established a genuine trade-mark, therefore the defendant cannot pass the burden to the plaintiff; but defendant having interposed the defense of abandonment, it must prove it."), *modified*, 85 F.2d 75 (2d Cir.), *cert. denied*, 299 U.S. 601, 57 S.Ct. 194, 81 L.Ed. 443 (1936).

The reason for placing the burden on one asserting transformation is no less compelling where a common law trademark has been found to be valid, than where a registrant of a trademark is favored with the presumption of validity. The court in *Saratoga Vichy Spring Co., Inc. v. Lehman*, 625 F.2d 1037, 1043 (2d Cir.1980) applying § 1127 to a common law trademark claim, stated:

A threshold issue concerning the abandonment claim is the choice of governing law. State law governs the issue of abandonment insofar as that issue affects plaintiff's state law claim, but it is not clear whether federal or state standards govern the issue of abandonment of a nonfederal trademark that is asserted as a defense to a claim of infringement of a federal trademark. Since New York state law on the issue of abandonment, even if applicable, is not particularly well developed, it is appropriate to apply federal law by analogy, with respect to both the state and federal claims. This is what the New York trademark statute's undefined use of the term "abandonment" suggests, *see* N.Y. Gen.Bus.Law § 367(4)(a). . . .

■ The court in *Saratoga Vichy* further noted that "abandonment, being a forfeiture of a property interest, should be strictly proved, *see* 1 J.T. McCarthy, Trademarks and Unfair Competition § 17.3 at 592–93 (1973)." *Id.* at 1044.[5] The same reasoning applies to transformation. Defendants have not met their burden of proof.

We recognize that dictionaries since 1962 have described the Murphy bed as a generic term, and that news reports at times refer to a type of bed that is concealed in a wall or closet as a Murphy bed. (Ex. 6). We find, though, that dictionary references are not conclusive proof of a mark's generic nature. *See* R. CALLMAN, *supra,* § 18.25 at 151.

Nor is the limited use by one competitor sufficient proof. Wall Unit Warehouse, Inc., a competitor of Murphy, advertised its wall bed in newspapers in Southern Florida as a "Murphy Bed" prior to 1982, but ceased on protest from Murphy. From October 10, 1982 to July 13, 1986, Wall Unit Warehouse advertised their wall beds as "Murphy Type Beds."[6] Wall Unit Warehouse, Inc. is the only Murphy competitor that has used or attempted to use the Murphy mark in advertising and sale of its product. Murphy's largest competitor, SICO, advertises its bed as a "Wall Bed" or a "Modular Wall System." Other competitors call their products Zeus, Odin (Cheshire), Disappearing Bed (Doyle), Feather Light Wall Bed (Foxfire), Wall–A–Bed (Simmons), Merlin Bed (Sharps). (Ex. 5). No distributor, factory agent, franchisee or retailer offering the wall beds of these competitors other than Wall Unit Warehouse has advertised the product of the manufacturer as a Murphy bed or Murphy type bed or otherwise used the mark Murphy bed in a generic sense.[7]

Since November 1981, Murphy has protested the use of its trademark by newspapers in the generic sense (e.g., letter to Journal–News dated November 2, 1981; Miami–Herald correction in "Action Line" column). Murphy has monitored the improper use of its trademark during the period November 1981 to the present and has taken appropriate steps to protect its mark (e.g., letters to Wall Unit Warehouse, Inc. dated March 1, 1984 and June 29, 1984) (Ex. 9).

Manufacturers of wall beds and their authorized dealers understand that Murphy bed has been a product of Murphy and the Murphy family for more than 80 years. While it is true that some purchasers of wall beds think of the product as a Murphy bed in the generic sense, defendants have failed to establish a widespread understanding by the consuming public that Murphy bed is a generic term.[8]

*Denial of Registration by the Trademark Trial and Appeal Board*

■ The Trademark Examining Attorney reported that the trademark Murphy bed was generic based on three dictionary definitions of Murphy bed,[9] and newspaper articles using the trademark generically, i.e., June 6, 1982 New York Times, June 20, 1982 New York Times, March 1, 1982 Washington Post, May 9, 1983 U.S. News and World Report. *See* 223 U.S.P.Q. at

---

5. 3 R. CALLMAN, *supra,* § 18.25 at 152 states: In an infringement action, it is the defendant's burden to prove that the plaintiff's trademark has passed into the public domain. This is a heavy burden to sustain, and the mark should be protected unless there is convincing evidence of its having become a generic term, particularly when the trademark owner did nothing to deprive his mark of its trademark character. It need not be shown that to the entire consuming public the mark has lost its trademark significance. A minority, no matter how small, may still be aware of, and use it in, its trademark sense.

6. The court considered copies of approximately 100 newspaper advertisements submitted together with a memorandum filed April 11, 1988 as part of the record.

7. On April 27, 1982 Murphy wrote Bassett Furniture Co. protesting the use of its trademark on a sleeping device that was not concealed in the wall. We do not regard the infringement as an attempt to use the mark in its generic sense.

8. Though the cases suggest that the burden of proof is by "clear and convincing" evidence, the court finds defendants failed to establish abandonment by a "preponderance of the evidence."

9. The TTAB noted additional dictionaries defining Murphy bed. *See* 223 U.S.P.Q. at 1031.

1032. The TTAB agreed that "certain of the references could be interpreted to mean either a specific bed sold by the Murphy Company or a type of bed." *Id.* The TTAB, affirming the Trademark Examining Attorney, concluded:

> Based on the foregoing, ... we are of the opinion that MURPHY bed has for a long period of time been used by a substantial segment of the public as a generic term for a bed which folds into a wall or a closet.

223 U.S.P.Q. at 1033.

This court is not, however, bound by the findings of the TTAB. The Eleventh Circuit has noted that:

> Congress limited the res judicata or collateral estoppel effect to be given the decisions of the TTAB because the Lanham Act provides for extensive judicial involvement in the registration and protection of trademarks.... [T]he ability of courts to hear appeals on a *de novo* basis reflects a Congressional intent not to invoke the immunizing doctrines of res judicata or collateral estoppel with regard to TTAB proceedings. In this Circuit a court hearing an infringement claim is not legally and conclusively bound by a prior decision of the TTAB regarding the same trademark dispute.

*Freedom Savings and Loan Ass'n v. Way,* 757 F.2d 1176, 1180 (11th Cir.), *cert. denied,* 474 U.S. 845, 106 S.Ct. 134, 88 L.Ed. 2d 110 (1985); *see also Volkswagenwerk Aktiengesellschaft v. Wheeler,* 814 F.2d 812, 819 (1st Cir.1987) ("A refusal by the PTO to register a mark does not preclude the owner of a mark from his right to use it (citation omitted). And as this court has held, the cancellation of a trademark registration does not extinguish common law rights that registration did not create (citation omitted).").

While according "great weight" to the decision of the TTAB, *see Syntex Laboratories, Inc. v. Norwich Pharmacal Co.,* 437 F.2d 566, 569 (2d Cir.1971), we nevertheless find that the Murphy Bed trademark has not been transformed into a generic term. For the reasons stated, we find that defendants failed to prove that "Murphy bed has for a long period of time been used by a substantial segment of the public as a generic term for a bed which folds into a wall or closet."

## II. *Unfair Competition*

■ We turn to the broader right of Murphy, i.e., the right to exclude any third party from using a family name in competition with the owner of that name. "[C]ompetition must be 'fair' both to the consumer, and so far as possible, to the trade. Consumer protection has been limited (in this context) to the prevention of confusion, i.e., the customer should not be misled into purchasing an article from one producer in the belief that it was made by someone else or emanates from some other (but unidentified) source." *Hygienic Specialties Co. v. H.G. Salzman, Inc.,* 302 F.2d 614, 619 (2d Cir.1962). Palming off gives rise to an action for unfair competition. The Court in *Hanover Star Milling Co. v. Metcalf,* 240 U.S. 403, 413–14, 36 S.Ct. 357, 360, 60 L.Ed. 713 (1916) (quoting *Perry v. Truefitt,* 6 Beav. 73), noted:

> "[A] man is not to sell his own goods under the pretense that they are the goods of another man; he cannot be permitted to practise such a deception, nor to use the means which contribute to that end. He cannot therefore be allowed to use names, marks, letters or other *indicia* by which he may induce purchasers to believe that the goods which he is selling are the manufacture of another person." (emphasis in original).

Trademark infringement is part of the broader claim of unfair competition. *Standard Paint Co. v. Trinidad Asphalt Mfg. Co.,* 220 U.S. 446, 457, 31 S.Ct. 456, 458, 55 L.Ed. 536 (1910); *Jean Patou, Inc. v. Jacqueline Cochran, Inc.,* 201 F.Supp. 861, 863 (S.D.N.Y.1962), *aff'd,* 312 F.2d 125 (2d Cir.1963).

Zarcone's practice of passing off products of his own manufacture as Murphy products extended over a long period of time. It included the sale of 109 beds to Magnolia Builders as Murphy beds under Murphy style numbers. Though no orders

were placed with Murphy since May, 1986 (the last order being April 21, 1986), he advertised the products he manufactured as Murphy beds at least through September 1987.

Zarcone's advertisements in newspapers published in Southern Florida represented the wall bed he manufactured as "Murphy Bed Co. of America, Inc.—Original Wall-Bed Systems" and "The New Murphy Beds ... Original Wall Bed Systems." (Ex. 37). On at least one occasion he used the phrase "The Original Since 1904" in association with the name "Murphy Bed Co." (Tr. 278).

Zarcone was aware that a substantial number of potential buyers of the wall bed bearing the trademark Murphy or Murphy bed identified the bed as plaintiff's product. He intentionally represented his product as plaintiff's wall bed.

Murphy sustained its claim of unfair competition.

*Breach of Contract*

█ The findings made herein on the trademark infringement and unfair competition claims establish the breach of the December 9, 1981 franchise agreement in which Zarcone agreed that:

5) Whenever the Murphy name is used, it must be in capital letters and identified by the word trademark or TM adjacent to Murphy. Cabinets or other material not furnished by Murphy will not be promoted or sold as Murphy Products.

....

8) Upon termination of this agreement Interior Sleep Systems, Inc. agrees to discontinue the use of the name "Murphy Bed."

These findings defeat the affirmative defenses of estoppel, failure of consideration and fraud, which rest on the claimed validity of the trademark and the failure of William K. Murphy. The fraud defense is based on a claim that Zarcone was induced to enter into the contract dated December 9, 1981 on the representation of "the existence of valuable trademark rights...." (Defendants' post-trial memorandum at 23).

█ Our finding that Murphy owned the trademarks "Murphy" and "Murphy Bed" disposes of these defenses. However, even if the trademarks were invalid, it does not follow that the contract would be void. A defense of fraud in the inducement (or a claim of fraud as asserted by Zarcone by way of counterclaim) cannot be sustained without proof that Murphy was aware of the falsity of the representation, and made the representation with intent to deceive Zarcone, and that Zarcone entered into the contract believing the representation to be true. *See Simcuski v. Saeli,* 44 N.Y.2d 442, 451–52, 406 N.Y.S.2d 259, 264, 377 N.E.2d 713, 718 (1978); *M. Lowenstein & Sons, Inc. v. Weinbaum,* 23 A.D.2d 831, 832, 259 N.Y.Supp.2d 398, 400 (1st Dep't 1965) citing *Sabo v. Delman,* 3 N.Y.2d 155, 161–62, 164 N.Y.S.2d 714, 718, 143 N.E.2d 906, 909 (1957).[10] The remaining affirmative defenses also fail insofar as they relate to the defendants in this case.[11]

*Counterclaims*

No further discussion is necessary to dispose of the following counterclaims to the extent that they assert claims against Murphy. The following counterclaims are dismissed:

Count I—Declaratory Judgment

Count II—Invalid Contract Under Franchise Law

Count III—Breach of Contract [12]

---

**10.** We do not reach the question of waiver of a claim of misrepresentation where the means of knowledge is available to Zarcone and he fails to make reasonable inquiry that would have provided him with the truth. *See Shappirio v. Goldberg,* 192 U.S. 232, 241–42, 24 S.Ct. 259, 261, 48 L.Ed. 419 (1904); *Marine Midland Bank v. Palm Beach Moorings, Inc.,* 61 A.D.2d 927, 403 N.Y.S.2d 15, 17 (1st Dep't 1978).

**11.** Zarcone asserted res judicata and collateral estoppel as a Fifth Affirmative Defense by reason of the TTAB denial of registration. That defense has been adequately discussed.

**12.** Defendants' attempt to convert Murphy's efforts at protection of its trademark to proof of a breach of contract is ludicrous. There is a total absence of any proof that plaintiff breached the agreement.

Count V—Fraud and Misrepresentation

Counts IV and VI through XI are also dismissed as against Zarcone and the other defendants in this action.

## CONCLUSION

Consistent with the findings herein, and inasmuch as defendants do not deny owing the amount demanded, plaintiff is awarded the sum of $6,330 on its first claim, breach of contract for goods sold and delivered and an account stated. Because we have dismissed defendants' counterclaims, there will be no offset of any part of this sum. This judgment amount is against Interior Sleep Systems, which ordered the beds. Damages resulting from infringement of the Murphy trademark will be assessed against both Zarcone personally and the corporations participating in the violations.

Plaintiff Murphy Door Bed Co., Inc. is granted a preliminary injunction enjoining all defendants from violating Murphy's trademark rights and Murphy's right against unfair competition. The court grants the parties the opportunity to aid in framing an injunction order consistent with the findings made herein. The matter is scheduled for that purpose on June 1, 1988 at 9:00 a.m.

Trial on the issue of damages is scheduled for July 25, 1988.

SO ORDERED.