**THIN FILM LAB, INC., Plaintiff,**

**v.**

**Carmelo COMITO, individually and doing business as Universal Thin Film Lab and Universal Thin Film Lab, Inc., Defendants.**

**No. 00 CIV. 3489 MDF.**

United States District Court,
S.D. New York.

Sept. 3, 2002.

Jon A. Simonson, Blatchly & Simonson, New Paltz, New York, Robert J. Berman, Hackensack, New Jersey.

## DECISION ORDER

FOX, United States Magistrate Judge.

The parties consented to try this matter before me pursuant to 28 U.S.C. § 636(c). Plaintiff Thin Film Lab, Inc. ("Thin Film"), an optical coating firm headed by Gregory Enzor ("Enzor"), commenced this lawsuit in April 2000 against Defendant Carmelo Comito ("Comito"), a former employee who created his own optical coating firm, Defendant Universal Thin Film Lab, Inc. ("Universal"). Enzor seeks injunctive relief and damages for misappropriation of trade secrets and unfair competition. In particular, Enzor argues that Comito unfairly solicited Lucent Technologies, a former customer of Thin Film, using confidential information, stole confidential coating designs for the bismuth-iron-garnet ("BIG") substrate from Thin Film's laboratories, and created a double-planetary rotation device ("DPRD") similar to Enzor's, using designs stolen from Enzor. Comito denies these allegations and seeks pro-rated back-payment of bonuses to which he claims he is entitled pursuant to his employment agreement with Enzor.

A bench trial in this matter commenced on May 13, 2002, and concluded on June 20, 2002. For the reasons that follow, the court finds that Comito and Universal violated Thin Film's trade secrets by unlawfully soliciting one of its most lucrative customers and creating a double-planetary rotation device that was nearly identical to the unique DPRD originally crafted by Enzor. However, Thin Film has failed to demonstrate that Comito violated its trade secrets regarding the $Si02$–$Hf02$–$Si02$ coating formula for the BIG substrate. Finally, Comito has failed to show that he is entitled to the back-payment of pro-rated

bonuses for 1997. The following constitutes the court's findings of fact and conclusions of law.

### FINDINGS OF FACT

### I. Plaintiff Thin Film Lab, Inc.

Thin Film is a privately-held corporation, originally incorporated in West Hurley, New York. (T: 93).[1] Thin Film's primary business is the designing of anti-reflective coatings for optical lenses used in military devices, fiber-optic communications cables and mundane items such as glasses and camera lenses. (T: 14–15). Gregory Enzor is an optical engineer and the president of Thin Film. (T: 14).

Enzor started working in the optical coating field in 1968, when he began employment with Vacuum Instrument Corporation making parts for vacuum systems within which the optical coatings were done. (T: 17). From 1976 to 1980, he worked at Broomer Research building and repairing vacuum systems as well as performing a variety of optical coatings. (T: 18). At Transworld Optics, from 1980 to 1983, Enzor performed optical coatings, created optical coating designs, and maintained and repaired vacuum coating chambers, including planetary rotation devices. (T: 19, 23–24). In 1983, Enzor began working at Continental Optical, where he built a coating device, created coating designs and performed optical coatings. (T: 24). There, he worked alongside Defendant Comito, and they co-managed the coating engineer group, creating coating designs and operating vacuum chambers. (T: 26). While both were working at Continental, Comito taught Enzor how to use the Songer computer software to create coating designs and formulas, as it was the standard in the industry to use this software for this purpose. (T: 546–47, 560).

This computer program was created by Larry Songer, a consultant at Continental. (T: 882). From 1984 to 1986, Enzor worked at Photronics Corporation, doing design work, using planetary rotation devices to do optical coatings, and maintaining and repairing coating equipment. (T: 29). In all of these work experiences, Enzor occasionally used silicon dioxide ("SiO2") and hafnium oxide ("HfO2") to coat substrates. (T: 484). Every facility at which Enzor worked was locked with a security system and armed with a burglar alarm system; public access to the facilities was denied, and the coating designs used by each company were kept in secure filing cabinets. (T: 33).

In 1986, Enzor started his own business, Thin Film. (T: 34). First, he purchased a Balzer 510 vacuum chamber and created a double planetary rotation device largely by his own hand. (T: 35). Because of coating problems that he had seen from his prior work experience, such as unreliability, warping and jamming of the coating system (T: 27–28), Enzor created his planetary rotation device to be different from all those that he had previously seen. (T: 36). Although some of the parts used to create his first planetary rotation device were store-bought, Enzor hand-made many of them, and he modified the store-bought pieces to suit his own specifications and to prevent the problems that arose with other planetaries. (T: 77). Every piece, from the sprockets to the spindles to the mounting systems to the monitor bridge, was different from anything that Enzor had seen on planetary systems in his prior experience. (T: 52–64). These precise modifications allowed the planetary to have increased productivity due to less frequent break-downs, fewer machine jams, and more accurate coatings, and

---

1. The abbreviation "T" followed by a page number indicates the relevant pages of the trial transcript.

generally resulted in a machine that was better than any Enzor had seen before. (T: 420–21, 491). In total, Enzor spent about three months and approximately $11,000 to $17,000 building this first double planetary rotation device. (T: 490). The design for Enzor's planetary rotation device was completed and written down in October of 1986. (T: 37–38). Enzor later created four more planetaries based on this original design, and those machines were put together by Thin Film machinist Tom Schofield. (T: 39–40, 122–3).

Enzor then set out to find customers for his new company by advertising in industry trade papers, making hundreds of cold calls to potential customers and mailing out hundreds of solicitations over a span of one and a half years. (T: 93–94). As a result of Enzor's efforts, Optics For Research ("OFR") became one of Thin Film's anti-reflective optical coating customers. (T: 95–96). Enzor utilized the Songer computer software for Thin Film's coating work as well. (T: 93). In the course of performing coatings for OFR, Enzor became familiar with a substrate called BIG, or bismuth-iron-garnet, an infrared material which was manufactured by a company then known as Bell Labs, and used by OFR in its products. (T: 96). OFR requested that Thin Film place an anti-reflective coating on BIG. (T: 97). Because BIG was going to be used in undersea fiber-optic cables, Thin Film was required to coat BIG so that it passed several endurance tests, such as a slicing operation, an adhesion test, and a boiling water test, to ensure that the coating remained firm and without defects. (T: 98–99). Enzor created the coating design for BIG by himself, and in 1990, he began to coat the substrate using the Herpin theory to create a three-layer combination of $SiO_2$ and $HfO_2$. (T: 101).

Bell Labs later became Lucent Technologies. (T: 109). Thin Film was one of two companies that passed the qualification tests for coating BIG for Lucent. (T: 149, 194). From 1990 until 1999, Thin Film performed a large bulk of Lucent's BIG coating work, and Lucent quickly became one of Thin Film's largest and most lucrative customers. (T: 111). During this time, Enzor dealt mainly with Steve Licht, the gentleman in charge of the BIG program at Lucent. (T: 112). Licht came to see Enzor at least twice, either at the original West Hurley location or at the subsequent Milford location. (T: 112).

In 1991, Enzor hired his former coworker, Comito, on a part-time basis for help in getting a vacuum chamber up and running. (T: 114). Comito later became employed by Thin Film on a full-time basis under an employment agreement in which Enzor promised Comito an end-of-year incentive bonus of 10% of profits over $400,000 for that year. The agreement did not specify the duration of the employment and stated that it provided "no protection for either of us." (T: 115–16, 567). Comito's duties at Thin Film included building and fixing machines, creating coating designs and assisting Enzor with major business decisions. (T: 117). Enzor also designated Comito as the vice-president of Thin Film Lab, Inc. (T: 117). Comito did not participate in the creation of the BIG coating design, or in the actual coating process itself. (T: 112, 868). However, the main room where all the coating work was performed was small enough so that Comito was always within a few feet of the BIG coating chambers or the BIG coating run sheets. (T: 125–26). Here, Comito used $SiO_2$ and $HfO_2$ to coat materials other than BIG. (T: 871–72). The Songer computer program was utilized at Thin Film to assist in the creation and formulation of the various coating designs. (T: 884).

In 1995, Thin Film moved to Milford, Pennsylvania and became incorporated under the laws of that state. (T: 441).

Some employees of Thin Film, including Comito, possessed keys to the facilities at West Hurley and Milford. (T: 119–20). The plants were, however, armed with burglar alarm systems and locked to the public so that no one but those authorized could look at the run sheets used to guide the coating engineers in their coating runs. (T: 120). Enzor, in fact, gave specific instructions to his staff to keep the coating materials and designs confidential, and stamped his run sheets "confidential." (T: 119–20). Enzor also gave similar instructions regarding the designs and plans that he created for the planetary rotation device. (T: 418). In addition, each employee was required to sign a company policy acknowledging the prohibition against stealing Thin Film's property, including coating designs and processes. (T: 426).

Throughout the mid–1990s, Thin Film was the best and most reliable optical coater used by Lucent to coat its BIG substrate. (T: 197). In fact, Lucent was giving about 80% of its BIG coating business to Thin Film during this period. (T: 150, 206). At this time, there were many published articles available to the industry regarding BIG coatings, for although it was new, it was considered to be just another high-index material. (T: 156). Towards the late 1990s, Thin Film began to encounter difficulties in dealing with Lucent and in coating BIG. (T: 152). These difficulties included the BIG substrate pieces getting mixed up either before delivery to Thin Film or after coating at Thin Film, slow delivery turnaround times (three days instead of one), and wax buildup on the substrate pieces ·that Lucent sent to Thin Film which resulted in inaccurate coatings. (T: 152, 170). The problems were eventually addressed, and Lucent never intended to terminate Thin Film as its BIG coater. (T: 177–78, 431). Nonetheless, in 1999, Lucent stopped sending the bulk of its BIG coating work to Thin Film. (T: 111). This was less in part because of the coating and delivery problems Thin Film had encountered and mainly due to Lucent's need for a second supplier to meet increased coating demand. (T: 177). Lucent had no reason to discontinue its business with Thin Film (T: 199), and would have continued the same level of business with Thin Film until any additional capable vendor appeared. (T: 204).

In May 1997, Comito handed a letter of resignation to Enzor, with an offer to continue working under different employment terms. (T: 568, 853). Enzor was unwilling to reduce the number of hours Comito was working or to increase his salary, so he released Comito from employment. (T: 444–45). After Comito left Thin Film, he and Enzor had conversations in which Comito asked for his bonus from the first part of the 1997 calendar year. (T: 462). However, by May 1997, Thin Film had not yet earned $400,000 in profits for that year. (T: 445). About a month or two after Comito left, Enzor discovered that his sketches and plans for the original double planetary rotation device were missing. (T: 462). He had not had occasion to look for them earlier, but he knew that Comito was the only person who left Thin Film during that time. (T: 462–63). Within three or four months, Enzor learned that Comito was operating his own business, using the name Universal Thin Film Lab. (T: 463). Then, in the fall of 1998, Enzor found out that Universal Thin Film Lab was coating the BIG substrate for Lucent, at the same time that Thin Film's BIG business volume from Lucent dropped sharply until it eventually disappeared. (T: 463–64).

## II. Defendant Carmelo Comito

Carmelo Comito is the president and chief executive officer of Universal, an optical coating company. (T: 810). Comito began his career in the optical coating industry in 1980, when he became em-

ployed at Continental Optical as a coating technician. (T: 811). While at Continental, Comito became a coating engineer and manager, supervising the design and processing of thin film coatings. (T: 812). When creating designs for coating various substrates, Comito used the Songer computer software. (T: 820). About two years after Comito started working at Continental, Enzor also became employed there and worked with Comito in the coatings department. (T: 812). Although Comito was not involved in the creation of any planetary rotation devices at Continental, he, together with Enzor and others, helped to modify and maintain the machines. (T: 813–14). Comito left Continental in 1985 and began employment at Inrad Incorporated, first as a coating engineer, then as vice president of coating. (T: 815). At Inrad, Comito continued his work on modifying and maintaining double planetary rotation devices, and again used the Songer computer software to create coating designs. (T: 818–20). Using the Herpin theory, he performed many coatings on a substrate called lithium niobate, using a combination of $SiO_2$ and $HfO_2$. (T: 828–29).

After five years at Inrad, Comito started work at Thin Film in 1990, first as a part-time engineer, and later as a full-time employee. (T: 835). As per the terms of the employment agreement, every January, Enzor was to pay Comito an annual bonus of 10% of the profit exceeding $400,000 from the previous calendar year. (T: 838). Enzor and Comito never discussed the payment of pro-rated bonuses should Comito's employment be terminated before the end of a calendar year. (T: 839). In addition, Comito understood Enzor's statement that "no protection for either of us" spoke for itself. (T: 841).

During Comito's employment with Thin Film, Enzor referred to him as vice president, and payroll records indicated that Comito was vice president of Thin Film.

(T: 118, 842). As vice-president of Thin Film, Comito was authorized to interact with customers, make binding agreements such as giving price quotes to potential customers, and sign official documents. (T: 424). For example, Comito signed state sales tax exemption certificates using the letters "VP" by his signature. (T: 118).

When Comito arrived at Thin Film, a double planetary rotation device, created by Enzor, was already in use. (T: 844). In fact, Comito was not involved in the creation of double planetary rotation devices at Thin Film at all. (T: 234). Comito normally worked on a coating device that was obtained after he began his employment at Thin Film, and used the other machines very infrequently. (T: 845). He worked on several hundred to a thousand coating designs at Thin Film, and usually created run sheets for each of these. (T: 845–46). While Comito was at Thin Film, he used the $SiO_2$–$HfO_2$ combination for coating. (T: 437).

Comito knew that Thin Film was coating the BIG substrate for Lucent Technologies, and that $SiO_2$ and $HfO_2$ were two of the materials used. (T: 848–49). However, he never coated or assisted in coating BIG while at Thin Film, nor was he otherwise involved in BIG coating. (T: 846, 849). Comito had opportunity to be introduced to the Lucent representatives who visited the Thin Film plant, including Steve Licht, and knew Licht to be associated with the BIG coating program at Lucent. (T: 271, 849–50).

In May of 1997, Comito submitted a letter of resignation to Enzor in which he offered to continue working for an increase in salary in place of an annual bonus. (T: 851–52). Enzor refused these altered employment terms and asked Comito to leave Thin Film immediately. (T: 853). Comito did so, and in the belongings he packed, he included a Rolodex which contained,

among other entries, the names, phone numbers and addresses for clients, business contacts and suppliers of Thin Film. (T: 445, 854). He did not take any run sheets for coatings that he had performed. (T: 854–55).

Within a month of leaving Thin Film, Comito decided to open his own optical coating business. (T: 856). In the summer of 1997, he incorporated Universal, and that fall, he obtained a facility in Newburgh, New York. (T: 857). Comito performed some coating work on behalf of Kevin McKeon, who polished materials and routed them to Comito for coating. (T: 859). Comito became aware that McKeon was sending him coating jobs for Lucent Technologies. (T: 154, 860). Thereafter, he decided to call Steve Licht at Lucent, and informed McKeon that he could coat the BIG substrate and that Licht knew this. (T: 271–72). As a result, McKeon gave Comito's phone number to Licht and instructed him to call Comito for details regarding Comito's ability to coat BIG. (T: 159, 275). Licht asked his coworker Bob O'Connor to send samples of BIG to Universal to see if it qualified to perform the coating work required. (T: 200). O'Connor was led to believe that Comito developed the BIG coating process while at Thin Film and performed BIG coatings for Thin Film. (T: 202–03). Ultimately, Universal qualified to coat BIG for Lucent. (T: 204).

Comito then began coating BIG for Lucent, using the Herpin theory to develop a three-layer coating combination of $SiO2$ and $HfO2$, telling O'Connor that the coating information was created by him and was proprietary. (T: 211, 867, 869). He encountered similar difficulties in coating Lucent's BIG as Enzor had seen, such as wax buildup on the BIG samples and adhesion problems. (T: 863–64). He resolved these issues and offered Lucent a 24–hour turnaround time period for delivery of the coated BIG. (T: 867). By 1999, Universal had obtained about 90–95% of Lucent's BIG coating business. (T: 206).

Also in 1999, Comito began to employ Schofield as a machinist, first on a part-time basis, then on a full-time status. (T: 235). Working off of "rough sketches" that Comito possessed, Schofield created a double planetary rotation device for Comito, designated the CHA–2, that was the spitting image of Enzor's first machine. (T: 236). In fact, Enzor's machine and the CHA–2 that Schofield built for Comito based on the rough sketches were "virtually identical," and the first time Schofield saw any machines like these was at Thin Film. (T: 238–39). Schofield recognized some of the rough sketches as being those that Enzor created for Thin Film and that he referred to when building Thin Film's planetary rotation devices. (T: 237). After completion of the planetary rotation device, Schofield reorganized, redrew and standardized the rough sketches, informing Comito that he would throw the old, rough sketches away. (T: 247). Comito gave no Schofield no instruction to keep the rough sketches, nor did he inform Schofield that this lawsuit was pending at the time; had he done so, Schofield would not have thrown the rough sketches away. (T: 247, 249).

### CONCLUSIONS OF LAW

I. **Defendant Violated Plaintiff's Trade Secrets By Obtaining Lucent Technologies as a Customer and Constructing and Operating a Double Planetary Rotation Device Utilizing Plaintiff's Design, But Did Not Violate Plaintiff's Trade Secrets By Using a Similar SiO2–HfO2–SiO2 Coating Formula for the Bismuth–Iron–Garnet Substrate.**

A. *Trade Secrets: In General*

In New York, a trade secret is defined as "any formula, patterns, device or compi-

lation of information [that] is used in one's business, and [that] gives [the owner] an opportunity to obtain an advantage over competitors who do not know or use it." *Softel, Inc. v. Dragon Medical & Scientific Communications, Inc.,* 118 F.3d 955, 968 (2d Cir.1997) (*quoting* Restatement of Torts, § 757 comment b (1939)), *cert. denied,* 523 U.S. 1020, 118 S.Ct. 1300, 140 L.Ed.2d 466 (1998); *see also, Hudson Hotels Corp. v. Choice Hotels Intern.,* 995 F.2d 1173, 1176 (2d Cir.1993); *Integrated Cash Mgmt. Serv., Inc. v. Digital Transactions,* 920 F.2d 171, 173 (2d Cir.1990); *Delta Filter Corp. v. Morin,* 108 A.D.2d 991, 992, 485 N.Y.S.2d 143, 144 (3d Dept.1985).

Courts have considered the following six factors to be relevant in deciding whether particular information is a trade secret: "(1) the extent to which the information is known outside of the [plaintiff's] business; (2) the extent to which it is known by employees and others involved in the business; (3) the extent of measures taken by the owner to guard the secrecy of the information; (4) the value of the information to the owner and to his competitor; (5) the amount of effort or money expended in developing the information; and, (6) the ease or difficulty with which the information could be properly acquired or duplicated by others." *Anacomp, Inc. v. Shell Knob Services, Inc.,* 1994 WL 9681, at \*6–7 (S.D.N.Y.1994) (internal quotations omitted); *see also, Ashland Mgmt. Inc. v. Janien,* 82 N.Y.2d 395, 407, 604 N.Y.S.2d 912, 917–18, 624 N.E.2d 1007, 1012–13 (1993). The most important factor is whether the information is secret. *See Lehman v. Dow Jones & Co.,* 783 F.2d 285, 289 (2d Cir.1986). "Absolute secrecy, however, is not required." *Anacomp, Inc.,* 1994 WL 9681, at \*9, *citing A.H. Emery Co. v. Marcan Products Corp.,* 389 F.2d 11, 16 (2d Cir.), *cert. denied,* 393 U.S. 835, 89 S.Ct. 109, 21 L.Ed.2d 106 (1968). "The rule is only that a 'substantial element of secrecy must exist and this means so much

that except by use of improper means, there would be difficulty in acquiring the information.'" *Q–Co Industries, Inc. v. Hoffman,* 625 F.Supp. 608, 617 (S.D.N.Y. 1985) (*quoting A.H. Emery Co.,* 389 F.2d at 16).

In order for a party to succeed on a claim for misappropriation of trade secrets, the party must show that "(i) it possessed a trade secret and (ii) that the defendant used that trade secret in breach of an agreement, a confidential relationship, or duty, or as a result of discovery by improper means." *Hudson Hotels Corp.,* 995 F.2d at 1176; *see also, Integrated Cash Mgmt. Serv.,* 920 F.2d at 173. Further, "a former employee can be prohibited from taking trade secrets from his former employ[er] whether or not there exists an employment contract which prohibits competition." *Computer Associates Intern., Inc. v. Bryan,* 784 F.Supp. 982, 988 (E.D.N.Y.1992). However, protection of the trade secret will not attach "where the alleged confidential information is readily ascertainable from nonconfidential sources." *Cosmos Forms, Ltd. v. American Computer Forms, Inc.,* 193 A.D.2d 577, 579, 596 N.Y.S.2d 862 (1993).

Second Circuit courts have held that "an agent has a duty 'not to use confidential knowledge acquired in his employment in competition with his principal.'" *North Atlantic Instruments, Inc. v. Haber,* 188 F.3d 38, 47 (2d Cir.1999) (internal quotations omitted). *See also, Unisource Worldwide, Inc. v. Valenti,* 196 F.Supp.2d 269, 280 (E.D.N.Y.2002). The agent's duty exists during employment, "as well as after the employment is terminated." *North Atlantic Instruments, Inc.,* 188 F.3d at 47 (internal quotations omitted). This fiduciary duty "does not need to be formalized in writing ... and any inquiry into whether such obligation exists is necessarily fact-specific to the

particular case." *AM Cosmetics, Inc. v. Solomon*, 67 F.Supp.2d. 312, 320 (S.D.N.Y. 1999). A court may examine "whether a party reposed confidence in another and reasonably relied on the other's superior expertise or knowledge." *Id.; see also, Manufacturers Hanover Trust Co. v. Yanakas*, 7 F.3d 310, 318 (2d Cir.), *motion to vacate denied*, 11 F.3d 381 (2d Cir.1993); *Chester Color Separations v. Trefoil Capital Corp.*, 222 A.D.2d 276, 636 N.Y.S.2d 613 (1995). In essence, "ongoing conduct between parties may give rise to a fiduciary relationship that will be recognized by the courts." *Id.*

 Here, the Court finds that Enzor, the sole shareholder of Thin Film, designated Comito as vice president of Thin Film. On cross-examination, Comito conceded that Enzor entrusted him with the duties of vice president, including administrative and decision-making responsibilities, thereby creating a fiduciary relationship between the two men:

Q: Now, at Thin Film Lab, weren't you designated as a vice president of the company?
Comito: On occasion.
Q: Well, sir, you signed documents as vice president, didn't you?
Comito: Twice.
. . .
Q: Didn't you supervise employees?
Comito: Yes, I did.
Q: Did you give job quotes?
Comito: Yes, I did.
Q: Did you deal with customers?
Comito: Yes, I did.
Q: Did you coat design coatings all by yourself?
Comito: Yes, I did.
Q: You made administrative decisions, didn't you?
Comito: Concerning mostly myself.
Q: As part of your supervision of employees, didn't you make administrative decisions?
Comito: Limitedly.
Q: Well, you weren't the president, right? You were the vice president.
Comito: On occasion.

(T: 911–12). Comito even signed Thin Film documents, wherein he assumed the title and responsibility of being Thin Film's vice president:

Comito: It's a tax-exemption certificate.
Q: Was that filed with the State of Pennsylvania, Commonwealth?
Comito: It looks that way, yes.

Q: Did you sign it?
Comito: Yes, I did.
Q: Did you put the initials VP after your name?
Comito: I believe I did, yes.
Q: And you offered that to the State?
Comito: I was told to sign that.
Q: Did you sign it in the capacity of vice president?
Comito: I signed it as vice president.
Q: And did you know, in doing that, that you were representing to the State of Pennsylvania that you had authority to act as vice president—
Comito: Yes.
Q: —of Thin Film Lab?
Comito: Yes.

(T: 913). Therefore, as the vice president of Thin Film, Comito owed Enzor a fiduciary duty, both during and after employment at Thin Film, not to unfairly compete with Enzor.

**B. Plaintiff's Work .Relationship With Lucent Technologies Was a Trade Secret**

 "The question of whether or not a customer list is a trade secret is generally a question of fact." *A.F.A. Tours v. Whitchurch*, 937 F.2d 82, 89 (2d Cir.1991); *see also Chevron U.S.A., Inc. v. Roxen Service, Inc.*, 813 F.2d 26, 29–30 (2d Cir.1987); *Defiance Button Machine Co. v. C & C Metal Products Corp.*, 759 F.2d 1053, 1063 (2d Cir.), *cert. denied*, 474 U.S. 844, 106 S.Ct. 131, 88 L.Ed.2d 108 (1985). The determination of whether a customer list is a trade secret depends in part on whether or not the owner "took reasonable measures to protect [the] secrecy of the list," and "the ease or difficulty with which the information could properly be obtained from other sources." *A.F.A. Tours*, 937 F.2d at 89 (internal quotations omitted); *see also, Defiance Button Machine Co.*, 759 F.2d at 1063. A customer list which is "developed by a business through substantial effort and kept in confidence" may be found to be a trade secret and protected as such, as long as the information is not otherwise readily ascertainable. *Defiance Button Machine Co.*, 759 F.2d at 1063. "The mere fact that an employee has access to information the employer regards as confidential is not inconsistent with

treatment of the information as a trade secret," as long as the employer takes "appropriate precautions to alert the employee to the need to maintain confidentiality." *A.F.A. Tours, Inc.*, 937 F.2d at 89.

On the other hand, "[s]olicitation of an employer's customer by a former employee is not actionable unless the customer list could be considered a trade secret or there was wrongful conduct by the employee, such as physically taking or copying the employer's files or using confidential information." *Cosmos Forms, Ltd.*, 193 A.D.2d at 579, 596 N.Y.S.2d 862 (*quoting Levine v. Bochner*, 132 A.D.2d 532, 517 N.Y.S.2d 270 (2d Dept.1987)). In such a case, the former employee may still be enjoined from using the unlawfully-obtained information because he engaged in unfair competition. *See Ecolab Inc. v. Paolo*, 753 F.Supp. 1100, 1111 (E.D.N.Y.1991). The rationale for such an injunction is that the former employee "has breached a fiduciary duty to the employer by engaging in misconduct." *Ivy Mar Co., Inc. v. C.R. Seasons Ltd.*, 907 F.Supp. 547, 560 (E.D.N.Y.1995). *See also, Leon M. Reimer & Co. v. Cipolla*, 929 F.Supp. 154, 161 (S.D.N.Y.1996); *Leo Silfen, Inc. v. Cream*, 29 N.Y.S.2d 387 392, 328 N.Y.S.2d 423, 427, 278 N.E.2d 636 (1972) (holding that, for example, a physical taking of customer lists might give rise to a claim for breach of fiduciary duty).

First of all, the Court is persuaded that the existence of Lucent as a BIG coating customer of Thin Film constituted a trade secret. Enzor did not fail to take "reasonable measures to protect [the] secrecy" of Lucent as one of Thin Film's BIG customers. *A.F.A. Tours*, 937 F.2d at 89.

Q: Did you have any discussions about the competition?
Enzor: Either verbal or written, I had asked him not to contact my client list and not to use the name Thin Film Lab.
Q: What did Mr. Comito say to you?
Enzor: I don't think he spoke directly on either of those points.
Q: He didn't answer you?
Enzor: I don't believe so.

(T: 462). The reasonableness of Enzor's request is acknowledged by Comito's concession at trial that he understood the customer information developed by Thin Film Lab to be proprietary information. (T: 910). Moreover, Comito admitted his own view of the proprietary nature of Lucent as a customer of Universal:

Q: Are the persons of your staff—are your staff instructed not to reveal information concerning who the customers of your business are?
Comito: Not in general, but, at times, yes.
Q: Did that include Lucent?
Comito: Yes.
Q: And who you dealt with at Lucent?
Comito: Yes.
. . .
Q: The existence of Lucent is not a secret, is it?
Comito: No; it is not.
Q: What was it that your own employees were not to reveal?
Comito: They were not to disclose to my competitors who I was doing business with.
Q: How come?
Comito: I think that's generally accepted, being proprietary information.

(T: 954).

Nor was the customer information regarding Lucent's BIG program readily obtainable from "other sources." *A.F.A. Tours*, 937 F.2d at 89. In fact, there was no directory available to the public at large that would lead inquirers to the BIG group at Lucent, and one had to "know somebody who knows somebody" in order to know about Lucent's BIG group and product. (T: 141–42). The Lucent directories listing the departments and contact names and phone numbers were "considered proprietary" and although outsiders could ostensibly obtain a copy, "they shouldn't have one." (T: 186).

In addition, Thin Film profited greatly from having Lucent's BIG program as a coating customer. From the start of its coating work for Lucent in 1991, Thin Film's gross volume of business increased by almost sixty times at its peak in 1998,

resulting in a gross of about $157,570 that year. (T: 111). This Court is persuaded that the fact that Thin Film possessed Lucent as one of its largest and most lucrative customers provided Thin Film with an advantage over other optical coating companies, and this business relationship was a trade secret deserving of protection. *See Softel, Inc.*, 118 F.3d at 968.

Furthermore, the evidence that Comito breached a fiduciary duty to Enzor was overwhelming and persuasive. Because of his employment at Thin Film, Comito was familiar with the coating work that Thin Film performed for Lucent:

Q: And you knew of [Steve Licht] because you worked at Thin Film Lab, right?
Comito: I knew him at—I knew of him through Thin Film Lab and through Kevin McKeon.
Q: And, in fact, you only knew of BIG because of your employment at Thin Film Lab?
Comito: I knew of BIG through Thin Film Lab, yes.

(T: 956). Comito also knew the name of the original primary contact person for the BIG program at Lucent:

Q: Had you ever heard of or met Steve Licht while you were working at Thin Film?
Comito: I said I—I don't remember. Not that I remember. I heard of Steve Licht, yes, but I hadn't met him.
Q: Did you know what—when you heard of him, do you know in connection with what that was?
Comito: Yes.
Q: What's that?
Comito: Lucent Technologies and AR coatings on BIG.

(T: 849–50). Comito even spoke with Licht on the telephone "from time to time." (T: 900). However, knowing that Thin Film considered this customer relationship to be proprietary, and following the same proprietary rules later for his own business, Comito nonetheless took Thin Film's customer information regarding Lucent with him when he left his employment at Thin Film and utilized it in his own competing business:

Q: Did you keep any customer information in your Rolodex?
Comito: I believe there were some customer names in there.
Q: And when you left Thin Film Lab after your employment ended, you took that Rolodex with you, didn't you?
Comito: It had come with me when I started, and I took it with me, yes.
Q: But that included customer information for Thin Film Lab?
Comito: Yes.

(T: 910).

Q: And didn't you put all this together to compete with Thin Film Lab?
Comito: I used what I knew.

(T: 957). Therefore, this Court concludes that, in a clear breach of his duty towards Thin Film, Comito improperly used this confidential information about Lucent to promote his own optical coating business.

Finally, "an employee is free to compete with his or her former employer unless ... fraudulent methods are employed." *The NCN Co., Inc. v. Cavanagh*, 215 A.D.2d 737, 737, 627 N.Y.S.2d 446 (2d Dept.1995). At trial, both Enzor and Comito testified that Comito was not involved in the development of the BIG coating program at Thin Film and in fact had never coated BIG himself. (T: 112, 868). However, Comito gave Kevin McKeon and Bob O'Connor the false impression that he had not only performed BIG coatings while at Thin Film, but had developed the BIG coating process for Thin Film himself. (T: 202–03, 272). Because Comito raised the subject of BIG in conversations with McKeon, leading McKeon to think "that [Comito] was capable of doing it and Steve is aware that he was able to do it," McKeon referred Comito to Steve Licht of Lucent. (T: 272).

During cross-examination on this subject, Comito baldly alleged that McKeon had testified falsely regarding their conversations:

Q: Did you ask Kevin McKeon to contact Lucent?
Comito: No.

Q: So when he testified to that fact, he was lying?
Comito: Yes.
Q: Did you raise the subject of the BIG project with Kevin McKeon?
Comito: He initiated it.
Q: So when he said that you initiated it, he was lying?
Comito: Yes.
Q: Did you tell Kevin McKeon that you had coated the BIG substrate while working at Thin Film lab?
Comito: No.
Q: So when he testified that you told him that, he was lying?
Comito: Yes.

(T: 935–36). However, the Court does not find these allegations worthy of belief. The Court also is disinclined to credit Comito's version of his interactions with McKeon, given credible evidence to support McKeon's contradictory testimony regarding the same. In particular, Donna Shook, Universal's Production Manager, informed the Court that Comito told her that McKeon would be doing sales work for Universal in exchange for a sales commission. (T: 696). This confirms McKeon's testimony that he and Comito discussed a sales arrangement in which McKeon would direct customers to Universal, and Comito would pay McKeon a sales commission of sorts. (T: 273). Shook's testimony, taken with McKeon's observed demeanor on the witness stand, leads this Court to conclude that despite McKeon's candid admission to having negative feelings towards Comito (T: 288–89), he testified truthfully.

C. *The DPRD Developed by Plaintiff and Recreated by Defendant Was a Trade Secret*

■ The Court heard extensive and persuasive testimony regarding the unique qualities of Enzor's original handmade DPRD. Enzor produced a complete design for a DPRD, based on a series of sketches and plans, which would enhance the machine's reliability and productivity.

Q: And after the design was complete, did you actually set about to build this thing?
Enzor: Yes, I did.
Q: Who actually built it?
Enzor: I did.
Q: By hand?
Enzor: By hand.
Q: You lathed and you manufactured each part?
Enzor: I lathed and milled each part.

(T: 38).

There was also ample evidence to support the singularly unique nature of Enzor's DPRD. Tom Schofield, the machinist who made subsequent DPRDs for Enzor using Enzor's designs noted that although "[t]hey've been using gears and sprockets since the Middle Ages" (T: 264), based upon his experience, "the first time I ever saw [an elaborate] system like this is when I went to work for Greg." (T: 239). Bob Bobrowski, an engineer who testified as an expert witness in this matter, confirmed that Enzor's DPRD was "entirely fabricated as opposed to store bought," and indicated that although the fasteners, screws and sprockets were commercially purchased, even the sprockets "have been modified." (T: 303).

Bobrowski then went into detailed testimony, relating his comparison of fourteen aspects of Enzor's original DPRD and the DPRD manufactured by Comito (called CHA–2) and alleged to be a copy of Enzor's. Based on his experience with as many as fifty different coating chambers and planetaries and a detailed measurement of both DPRDs in question in this matter, Bobrowski concluded that the two machines were very similar, if not identical, in most of the fourteen examined aspects. First, he found that the design of the bayonet pins was the same in both machines and "[s]ome of the dimensions were identical," noting that this was "very strange if they were truly independently fabricated and independently conceived." (T: 313). Second, he stated that although the adjustable racks he examined on both

machines were different than any he had seen before on other machines, these two "were the same design," differed by "thousandths of an inch" and were "[p]hysically interchangeable." (T: 304–04). Third, Bobrowski testified that although he had never seen the design for the planet hubs on any other machine before, the two planet hubs for Enzor's machine and the CHA–2 were "in many respects identical." (T: 307).

The fourth component Bobrowski examined was the planetary plate, and he found that although the design was unique, some of the dimensions on both machines were "identical." (T: 307). Fifth, he examined the planetary drive chains on both DPRDs:

Q: How did the two [planetary drive] chains compare?

Bobrowski: Well, the chains were the same size. They were used the same way in that captured ring, which is kind of a unique way to use a chain.... [I]n fact, it's unique enough that I've never seen it before.... I've never seen chain used that way for any purpose in any function.

. . .

Q: How about the thickness of the chain?

. . .

Bobrowski: It's the same size, it's number 35 chain. And again, there's 20 sizes of chain commercially available from much smaller than that to much, much bigger than that. It just happened to be exactly the same size in both locations.

Q: Do you know if that system provides a functional advantage?

Bobrowski: Yes, it does.

(T: 308–10). Sixth, Bobrowski noted that the rectangular posts used in both machines were the same and found this to be "off, coincidental, whatever" because "[f]rom a purely vacuum theory viewpoint it's not the best thing to do." (T: 310–11). He expressed similar thoughts about the seventh component, the post mounting blocks, which had the same peculiarities, were "excessively complicated" from a theoretical viewpoint, and were completely unusual from a fabrication viewpoint. (T: 312).

Bobrowski found the eighth component, the rails in both machines, to be "absolutely the same, interchangeable from one location to the other." (T: 313). They were so similar, in fact, that "they look[ed] like they've been fabricated by the same person because he held them [ ] in the same manner, used the same type of tool...." (T: 313–14). This unusual design also served to enhance the functionality of both machines. (T: 314). Ninth, the monitor bridges in both machines were of the "same basic design," although there was a minor difference in the thickness of the metal; both bridges were thicker than normal in order to add a functional advantage. (T: 314–15). Tenth, Bobrowski noted that both machines utilized planetary drives mounted on the top of the chamber and used a self-connecting coupling, as opposed to the more usual method of attaching the drives from below to power the planetary device; this adjustment added a heavy-duty characteristic to the drive that other planetaries lacked. (T: 315–16).

Eleventh, Bobrowski examined "the large cylindrical object buried in the middle" and found that:

Bobrowski: Externally they measured the same.

Q: You mean identical?

Bobrowski: Yes. Identical within a hundred thousandths on an 8 inch diameter part.

. . .

Q: ... How does that compare with what you've seen commercially?

Bobrowski: Commercial systems use much, much smaller main hubs, much, much smaller bearings.

Q: What's the advantage of a bigger bearing?

Bobrowski: Bigger bearing tolerates the heat.

. . .

Q: How many different kinds of bearing sizes are there available?

Bobrowski: Thousands and thousands.

Q: Do you find it odd that there are identical bearings in that system?

Bobrowski: Yes. I would find it odd for something independently developed.

(T: 317–19). As to the twelfth component Bobrowski compared the planet spindles and found that "some of the dimensions were the same." (T: 319). The design incorporated bearings that were more than 50% larger than typical bearings, lending the two machines the advantage of being more robust than other planetaries. (T:

319–20). Bobrowski found this similarity to be odd because "you could have used metric bearings, you could have used inch bearings right off the bat and then there's thousands of sizes of each ... [but] [t]hese are the same." (T: 320).

The thirteenth component measured by Bobrowski were the planets. He discovered that despite a difference of diameter attributed to a matter of scaling, the planets in the two machines were of the same thickness, with "[t]he array of three holes to hold the pins, the same [and][t]hree pins attached to each, the same." (T: 320–21). This thickness was unusual and gave the machines the advantage of being heavier and thus sturdier. (T: 321). Finally, Bobrowski examined the planetary mechanism, and found that they were "the same system, used the same way to accomplish the same purpose." (T: 321). Ultimately, he concluded that "[t]he whole system is unique and it's duplicated from one to the other." (T: 321).

Defendants introduced the testimony of Jim Carrero, a plant engineer at Universal to attempt to persuade the Court that Enzor's DPRD design was not unique but was in fact similar to the design used to create two commercially developed planetary devices purchased by Universal. Carrero compiled a report in which he compared Enzor's DPRD and the two commercial planetaries, and found that those three planetaries contained similarities to each other. These similarities were conceded by Bobrowski, but he also noted that there were significant differences, such as bigger frames, smaller and thinner parts, and mounting and dimensional differences on the two machines purchased by Universal. (T: 598–601). Bobrowski concluded that although the "general concept of the operation is the same[,][t]he specifics are very different" between Enzor's DPRD and the two commercially purchased planetaries. (T: 601). In fact, he even stated that "[t]hey were a different

design altogether." (T: 306). Schofield also had opportunity to observe the two machines purchased by Universal, and testified that these machines and Enzor's DRPD were similar because they both happened to be planetary devices, but specific components, such as the bearings, the main bearing housing, the chip changer, and the support system were dissimilar and configured differently. (T: 241–42). Finally, as most of Carrero's descriptions provide no dimensions, this Court is not inclined to give credence to the validity of his report.

Carrero also emphasized the different cooling systems utilized by Enzor's DPRD and Comito's CHA–2, pointing out that the CHA–2 was water-cooled and Enzor's machine had no water cooling system. (T: 788). However, the Court is not concerned with minor differences and subsequent modifications made to the CHA–2 after its construction. The significant point to consider is whether or not Comito misappropriated Enzor's design for his unique DPRD and used it to build a nearly identical machine, regardless of what modifications are then added.

The Court finds that Bobrowski accurately concluded that the particular dimensions, specifications and details of Enzor's original design resulted in a DPRD that functioned exceedingly well and provided Enzor with a competitive advantage over other optical coaters in the industry:

Q: And all put together, what advantages would you find that this system had over the other systems that you've dealt with in your 30 plus years of experience?

Bobrowski: Other systems were more prone to jamming, they were more heat sensitive. ... So there's a productivity advantage there. There's a cleaning advantage in that you're not dealing with these little tiny parts that you typically have, so when you have to clean the system up, it's easier to clean and because it's more dirt tolerant, if you will, because there's larger clearances, you don't have to clean it as often.

(T: 321–22). Schofield also acknowledged the superiority of Enzor's DPRD because

of it's ability to "work under extreme conditions." (T: 244). The Court finds that it is precisely these kinds of advantages that made Enzor's planetary a protectable trade secret, and gives due credit to Enzor's expressed confidence in the unique details, specifications and tolerances of the design for his machine:

Q: And sir, can you tell the Court whether this design could be duplicated without having your detailed plans?

Enzor: No.

. . .

Q: Sir, when you say that it can't be duplicated, what specifically are you referring to?

Enzor: I'm referring to each, the dimensions of each and every part, every feature, every feature it has. I mean, if you made, if you had a million people making millions of planetaries you might have one that's the same as this, but outside just grinding out just huge numbers of different planetaries, that is a specific design with specific dimensions.

Q: And specific tolerances?

Enzor: Yes.

(T: 421–22).

The Court notes that Comito conceded his knowledge of the proprietary nature of Thin Film's mechanical designs. (T: 910). Strangely, at Universal, Comito provided Schofield with a series of rough sketches, which "looked very similar to Greg's" (T: 239), according to which Schofield constructed a DPRD that was "basically a splitting [sic] image of what I did for Greg." (T: 236). Excluding a few minor differences between Enzor's DPRD and Comito's planetary, the familiar sketches enabled Schofield to build a system that was "virtually identical" to Enzor's original, handmade planetary device. (T: 238). Comito also admitted that he "used the same bearing that was used at Thin Film Lab" and apparently desires this Court to believe that this just "turned out to be" a coincidence. (T: 950). However, the Court is unpersuaded that Comito happened to "come upon the exact same size" bearing, in a market offering "hundreds of different sizes." (T: 951). Schofield denied removing any plans or sketches from

Thin Film upon his departure, and this testimony was credible. (T: 261). Nevertheless, the Court finds that at least some of Enzor's personal sketches relating to his handmade DPRD made their way to Universal, thereby allowing Comito to construct a nearly identical machine. The Court also finds that Comito's actions constituted a violation of Enzor's protectable trade secret, namely his unique, almost completely hand-crafted and superior planetary device.

### D. The $SiO2$–$HFO2$–$SiO2$ Coating Formula for BIG Used by Plaintiff Was Not a Trade Secret

█ In general, although "matters of public knowledge or of general knowledge in an industry" cannot be considered trade secrets, "a compilation of the public information . . . in a unique way is, nonetheless, protectable as a trade secret." *Anacomp, Inc.*, 1994 WL 9681, at *8. *See also Integrated Cash Mgmt. Serv.*, 920 F.2d at 174; *Computer Assoc. Intern.*, 784 F.Supp. at 988. Here, the Court finds insufficient proof that the coating combination of $SiO2$–$Hf02$–$SiO2$, even as applied to the BIG substrate, was not public information, at least within the relevant optical coating industry.

Hoa Bui, an optical engineer for 15 years, most aptly stated a commonly-held opinion within the optical coating industry: "$SiO$ is the most common material in the world. Everywhere use $SiO2$." (T: 655). Fred Willey, the agreed-upon independent expert, also concurred with the assessment that $SiO2$ and $Hf02$ were "[t]he most commonly paired low-index/high-index materials across the UV and IR spectrum." (T: 390). Comito testified that the use of $SiO2$, $Hf02$ and $SiO2$ in a three-layer combination was, "in the industry, [ ] very well known and accepted." (T: 967). Even Enzor relied on common industry knowledge before using the $SiO2$–$Hf02$–$SiO2$ coating formula for BIG:

Q: Do I understand you to say that you drew the conclusion that [Si02 and Hf02] were good materials to use because you had read about them in periodicals and books over the years?

Enzor: Yes.

Q: And you had also used them for those purposes over the years, had you not?

Enzor: Yes.

Q: So that it didn't come as a surprise to you when you found it rather easy to design a coating for BIG using Si02 Hf02 and Si02, isn't that true?

Enzor: It was not a surprise.

Q: . . . As a matter of fact, you were able to create that design right off the bat, isn't that true?

Enzor: Yes.

(T: 545).

Thus, it is not a strenuous effort for the Court to believe that Comito had used Si02 and Hf02 prior to his work with the BIG substrate, particularly in his previous work coating the substrate lithium niobate, a material having an index of refraction very similar to that of BIG. (T: 828–29). Based on the industry literature he studied, as well as his own experience, Comito used Si02 quite frequently in his coating work at Continental and Inrad because it was durable, optically transparent, had a broad range of use and was inexpensive. (T: 822). While at Inrad, Comito even taught Bui to use Si02 and Hf02 to coat lithium niobate in a three-layer combination. (T: 661).

Given his coating history using Si02 and Hf02, several witnesses agreed that it would be likely that when presented with the BIG substrate and its index of refraction, Comito would again turn to the three-layer Si02–Hf02–Si02 coating formula. (T: 393).

Q: Are you familiar with the index of refraction of lithium niobate?

Goldstein: Yes, I understand it's about 2.2

Q: Which is almost identical to the BIG, is that right?

Goldstein: Almost identical.

Q: Is it your opinion that it is more likely than not that a material choice that would work on lithium niobate would also work on BIG?

Goldstein: Yes.

Q: So that if a party had previously used Si02 and Hf02 in a three-layer combination, that is Si02, Hf02, Si02, on lithium niobate, is it more likely or less likely that when faced with the prospect of coating BIG you could have used the same materials in the same order?

Goldstein: Very likely.

(T: 1073).

Q: . . . The question is, in your experience, would any reasonably competent coating engineer have come up with [the Si02–Hf02 coating combination]?

Goldstein: Yes.

(T: 1130–31.)

Q: . . . Presume [ ] that the plaintiff claims that when Mr. Comito went into his own business as Universal Thin Film and obtained the opportunity to do coatings of BIG, that he used Si02/Hf02/Si02 as his coating layers. Does that information in and of itself give rise to a conclusion on your part that Mr. Comito must have copied these materials from Thin Film?

Willey: No.

Q: Why?

Willey: As we've seen, Si02 and hafnium oxide are common coating materials for these sorts of applications. And you just indicated earlier that Mr. Comito had used these materials for lithium niobate.

(T: 395–96). Comito himself also credibly indicated that he turned to the Si02–Hf02–Si02 formula precisely because of his prior experience with lithium niobate, a material with a nearly identical index of refraction as BIG.

The likelihood that both Enzor and Comito would use the Si02–Hf02–Si02 formula to coat BIG is even greater given their familiarity with both the Herpin Indexing Theory and the Songer computer software, both of which are commonly used in the optical coating industry and which enabled him, and other coaters like him, to develop coating designs for particular materials. Comito used the Songer program while he worked at Continental and Inrad, and uses the program currently at Universal. (T: 820–21). He and Bui used the Herpin Indexing Theory to create formulas for anti-reflective coatings, using a low-index material on the outsides and a high-index material in the middle. (T: 662). Enzor also used both the Herpin Theory and the Songer program to develop the BIG coating used by Thin Film. (T: 546–57). He "punched in the index of the substrate[,][ ] punched in the index of

air[,][and] punched in the index of the two materials" and the Songer program provided the thicknesses of the materials that he should utilize. (T: 546).

Indeed, the creator of the Songer computer software, Larry Songer, provided the Court with the best insight into the use of his program:

Q: Why would an engineer not be able to figure out the thicknesses [of the coating layers] on his own using your wonderful system that you've created for the computer?

Songer: He can figure out the thicknesses on his own. You have to have the right starting point.

Q: And how do you arrive at the starting point?

Songer: You usually guess.

Q: ... [W]hat information do you use to arrive at what you think is a safe guess?

Songer: ... [T]he only thing you have to go by is index of refraction and dispersion, coating materials and the substrate.

Q: And that's the instance in which you would likely use what materials you had been using in the past for similar index of refraction substrates; isn't that right?

Songer: Yeah.

Q: Okay. And then how would you arrive at a thickness that you thought might work?

Songer: ... You can use a Herpin Indexing model or you can just put three random thicknesses in and let the computer come up with something. ...

Q: But there is nothing that an experienced coating engineer—that would stop an experienced coating engineer from coming up with a suitable coating, is there?

Songer: Suitable, no.

Q: And with suitable thicknesses; isn't that right?

Songer: Suitable, yes.

Q: Right. And this is—you said it was a moderately simple coating process, this BIG, isn't that right?

Songer: Relatively, yes.

(T: 1032–34).

Comito concedes that a particular coating design could be considered proprietary. (T: 967). However, given the relative ease with which an experienced coater could arrive at an accurate coating design using the Herpin Theory or the Songer computer software, this Court is not persuaded that the Si02–Hf02–Si02 formula and design used by Enzor to coat BIG was proprietary. Moreover, given some "substantial difference[s]" between the thicknesses of the layers used in each party's coatings, there is insufficient basis to con-

clude that Comito improperly copied Enzor's coating design for BIG. (T: 381–82). In fact, Willey explicitly concluded that "[t]he material thicknesses are not a copy of one another." (T: 383). The general similarities that existed between Enzor's and Comito's coating designs can be attributed to the "same mathematical formula" used by both based upon BIG's index of refraction, which would likely have led both to "come up with very similar thicknesses." (T: 383). Therefore, the Court finds that Enzor's Si02–Hf02–Si02 coating design does not constitute a trade secret deserving of protection, especially in light of Comito's own experience, understanding of industry practice, and use of the same Theory and software.

## II. The Employment Agreement Between Plaintiff and Defendant Does Not Accord Defendant the Pro–Rated Back–Payment of Bonuses

### A. *New York's Statute of Frauds Standard*

According to the New York Statute of Frauds,

a. Every agreement, promise or undertaking is void, unless it or some note or memorandum thereof be in writing, and subscribed by the party to be charged therewith, or by his lawful agent, if such agreement, promise or undertaking:

1. By its terms is not to be performed within one year from the making thereof or the performance of which is not to be completed before the end of a lifetime.

N.Y.Gen.Oblig.Law § 5–701(a)(1) (McKinney 1989). It is well-settled that "for a contract to fall within this provision of the Statute of Frauds, there must be absolutely no possibility of performance of the contract within one year." *Riley v. N.F.S.*

*Serv., Inc.*, 891 F.Supp. 972, 975 (S.D.N.Y. 1995). *See also, Ohanian v. Avis Rent A Car System, Inc.*, 779 F.2d 101, 106 (2d Cir.1985) ("The one-year provision has been held not to preclude an oral contract unless there is 'not . . . the slightest possibility that it can be fully performed within one year'."). In other words, a contract that is "capable" of being performed within one year of its making is outside the Statute. *See Zaitsev v. Salomon Brothers, Inc.*, 60 F.3d 1001, 1003 (2d Cir.1995); *North Shore Bottling Co. v. C. Schmidt and Sons, Inc.*, 22 N.Y.2d 171, 176, 292 N.Y.S.2d 86, 89, 239 N.E.2d 189, 191 (1968).

In addition, the Statute of Frauds also requires certain contracts to be memorialized in writing. *See* N.Y.Gen.Oblig.Law § 5–701(a) (McKinney 1989). *See also, Riley v. N.F.S. Services, Inc.*, 891 F.Supp. 972, 974 (S.D.N.Y.1995). "To satisfy the Statute of Frauds, the writings must 'completely evidence the contract which the parties made.'" *Poel v. Brunswick–Balke–Collender Co.*, 216 N.Y. 310, 314, 110 N.E. 619, 620 (1915). The essential terms of an employment contract include compensation and duration. *See Crabtree v. Elizabeth Arden Sales Corp.*, 305 N.Y. 48, 54, 110 N.E.2d 551, 553 (1953).

### B. *Defendant is Not Entitled to Pro–Rated Back–Payment of Bonuses*

"The uncertainty of the timing of performance [of Comito's employment agreement with Enzor] brings [this agreement] within the Statute of Frauds." *Riley v. N.F.S. Services, Inc.*, 891 F.Supp. 972, 976 (S.D.N.Y.1995). In June 1991, Enzor wrote a letter to Comito proposing that Comito become employed at Thin Film. The letter included salary and benefit terms, as well as a provision for an annual bonus of 10% of profits over $400,000 earned in a calendar year (January 1st to December 31st), payable at the start of the next calendar year. (T: 116, 837). The letter also stated that there was "no protection for either of us." (T: 116). Comito agreed to become an employee of Thin Film based on these offered terms, and also agreed to the bonus offer. (T: 838). When he accepted employment and agreed to the offered terms, he understood that there was no protection for him and that he would be expected to work out employment issues as they arose. (T: 841, 971–72). He also understood that only a full calendar year's profit of $400,000 would trigger the 10% bonus, and that he would not receive the bonus payment until the beginning of the following calendar year. (T: 929). Such an agreement is not capable of being performed within the span of one year, and therefore is rendered unenforceable by the Statute of Frauds. *See Riley*, 891 F.Supp. at 975.

The employment agreement also fails to satisfy the Statute because it does not "completely evidence" the contract that Comito and Enzor made. *Poel*, 216 N.Y. at 314, 110 N.E. 619. Enzor and Comito never discussed the earning of a pro-rated bonus in the event that Comito's employment ended in the midst of a calendar year. (T: 839). In fact, the letter sent by Enzor offering employment was "the only writing that existed regarding [Comito's] employment terms" (T: 909–10), and no other writing exists which might include a provision for pro-rated bonus payments. Even if Enzor's letter to Comito was enforceable as an employment contract, Comito would not be entitled to pro-rated bonuses because the terms of the contract had not been met as of May 1997 (generation of at least $400,000 in profits by Thin Film), (T: 929), and there is no additional writing satisfying the Statute of Frauds that provides for the pro-rated payment of the bonus. Therefore, Comito is not entitled to the back-pay of pro-rated bonuses for the months that he worked in 1997.

Finally, the Court finds that Comito's claim for back-pay of pro-rated bonuses is particularly misplaced in light of the following testimony:

Q: After you left, do you recall receiving checks tendered, through your attorneys, by Thin Film Lab?
Comito: Yes.
. . .
Q: Did you cash them?
Comito: Yes.
Q: Did you understand that those payments were tendered to you in satisfaction of all claims that you held against Thin Film Lab?
Comito: That was not my understanding. I was advised—
Q: Read the letter for us, sir.
. . .
Comito: . . . "Enclosed herewith, please find checks number 1764 and 1765, made payable to the order of Carmelo Comito, in the amounts of $1,527.25 and $381.39, respectively. These checks represent full and final settlement of all claims by and between Greg Enzor [ ] Thin Film Lab and Carmelo Comito."
. . .
. . .
Q: Sir, did you understand that the payments tendered to you were tendered in satisfaction of all claims that you held against Greg Enzor and Thin Film Lab?
Comito: Yes.
Q: And did you accept the payment?
Comito: Yes.
Q: And you knew that before you took the checks?
Comito: Yes.

(T: 931–33).

## CONCLUSION

The foregoing constitutes this Court's determinations of liability in this matter. The parties are instructed to appear for an in-person conference on *Friday, September 13, 2002, at 10:00 a.m.* in order to discuss dates for trial on the issue of damages.

SO ORDERED.